A99A2256. THE STATE v. HANSON et al.
(532 SE2d 715)

BLACKBURN, Presiding Judge.

The State appeals the trial court's grant of James Hanson and Deborah Sue Huddleston's motion to suppress evidence of marijuana found during a vehicle search following a traffic stop. Driver Hanson, who was not in violation of any traffic law, was stopped by Deputy Fred Sutton of the Camden County Sheriff's Department to check upon his physical condition, as he purportedly was weaving within his traffic lane. The court determined that the deputy's testimony was not credible and that the police conduct of the stop amounted to a ploy to create a basis to search defendants' vehicle where probable cause was lacking. We affirm.

Following a search of the vehicle and Huddleston's purse, driver Hanson and passenger Huddleston were each charged with one count of violation of the Georgia Controlled Substances Act, possession of marijuana with intent to distribute.

It was stipulated at the hearing that the hand-rolled cigarette found in defendant Huddleston's purse contained less than one ounce of marijuana and that the trunk of the vehicle contained 11.3 pounds of marijuana.

The defendants filed a motion to suppress all statements made by them and any evidence seized from the vehicle based on violations of the defendants' Fourth and Fifth Amendment rights. The trial

---

[26] See *Columbia County v. Doolittle,* 270 Ga. 490, 493 (3) (512 SE2d 236) (1999).

court granted defendants' motion following a hearing, holding inter alia:

## FINDINGS OF FACT

1. The vehicle driven by Defendant Hanson was observed weaving within its lane of traffic by a Camden County Deputy Sheriff who was working traffic on Interstate Highway 95.

2. Said vehicle promptly pulled over when the officer activated his vehicle's blue light.

3. The officer spoke with Defendants. While out of their hearing, he commented (for purposes of the videotape) that they appeared to be very nervous. Defendant Hanson told the officer he was a musician. He had long hair and a full beard. The vehicle had tinted windows.

4. The officer testified that he smelled marijuana when he was near the passenger area of the vehicle. He did not make a "verbal note" of that observation for the videotape, although he made such verbal notes for the videotape on less significant matters. The inclusion of an assertion in the officer's report that he smelled marijuana is not persuasive in light of the officer's obvious effort to inject relevant comments *sotto voce*, which convinces the Court the officer's testimony on that issue is not credible.

5. The officer found no evidence of intoxication or other basis for detaining Defendants.

6. The officer informed the Defendants that his investigation of the cause of their vehicle's weaving had ended, and after admonishing them to get some rest if they were tired, he informed Defendant Hanson that they were free to go. Mr. Hanson proceeded to the door of his vehicle and grabbed its handle.

7. The officer then directed Defendant Hanson to halt his departure from the scene.

8. As part of this new encounter with Defendants, the officer requested and received consent to search the vehicle.

9. Marijuana was found in the vehicle.

## CONCLUSIONS OF LAW

1. There was probable cause for a brief investigatory stop of Defendants' vehicle due to the officer's observation it was weaving in its lane of traffic. *Semich v. State*, 234 Ga. App. 89 [(509 SE2d 216)] (1998).

2. The public has a right to be free from "profiling" and

persons who exhibit physical and/or occupational characteristics thought to make them more likely to be violating the law than citizens in general cannot be subjected to differing law enforcement standards.

3. While the presence of certain characteristics may justify reasonable suspicion sufficient to support a brief investigatory detention, *Murphy v. State*, 230 Ga. App. 365 [(496 SE2d 512)] (1998), that detention must have a distinct ending point which is ascertainable to both the officers charged with enforcing the law and the citizens whom they encounter. This is essential because the concept that a person is free to leave the scene of a brief investigatory detention when that detention has ended will be stripped of its significance if officers feel the best method of inducing consent to a search is to notify the person detained that the encounter had ended, while in the mind of the officer there is a reason for further investigation of possible criminal offenses but no legal basis for additional detention of the subject. A rule of law which would encourage officers to tell citizens that the reason for their brief detention has ended while in fact the officer is planning to extend the encounter for the purpose of securing evidence of criminal offenses would encourage disrespect for the law.

4. The investigatory encounter authorized by the officer's observation of the weaving of Defendants' vehicle ended when the officer told Defendant Hanson he was free to leave and said Defendant left the location where he had spoken with the officer and put his hand on his vehicle door.

5. The conversation between Defendants and the officer, which disclosed that Defendant Hanson was a professional musician, the fact that said Defendant had long hair and a full beard, and the fact he was driving a vehicle with tinted windows and appeared to be nervous did not constitute probable cause for an additional investigatory encounter.

6. The consent of Defendants to a search of the vehicle was obtained outside the scope of a permissible investigatory encounter with a law enforcement officer. It was the product of an improper restriction placed upon their freedom of movement, because it occurred after the justifiable restriction on their freedom of movement warranted by the investigative stop for weaving had been terminated, pursuant to the officer's representation that the encounter had ended. The officer therefore had no legal basis for ordering Defendant Hanson to interrupt his departure from the scene after he had begun to do so.

Order, Camden Superior Court, dated June 9, 1999, filed June 10, 1999.

The trial court granted the State's motion to reopen the record and permit tender of the videotape viewed by the court at the hearing on the motion to suppress, as the court's decision was based primarily upon its consideration of that evidence, but otherwise denied the State's motion for reconsideration, providing inter alia:

> After considering the State's motion for reconsideration the Court finds said motion to be without merit. The foundation of the Court's decision granting the motion to suppress was not the propriety of the traffic stop of Defendants' vehicle, or the brief encounter that ensued as a result of that stop. The Court found that said encounter terminated when the officer told Defendant Hanson he and the vehicle were free to leave, and Defendant Hanson did in fact leave the scene of the encounter with the officer and return to the door of the vehicle. The officer's subsequent order that Mr. Hanson stop, after he had placed his hand on the door of the vehicle, was a subsequent, compelled encounter, and an interference with Defendants' freedom of movement and liberty which was not supported by probable cause.
>
> If, as a result of the initial encounter resulting from the officer's observation the vehicle was weaving within its lane of traffic, he had directed Defendants to remain on the scene until a drug dog could be summoned to conduct a free air search around the vehicle, a different question would be presented. The Court would be required to determine if the evidence adduced by the officer during the encounter constituted probable cause for detaining Defendants beyond a period which was reasonable for a brief investigatory stop. But that is not what occurred. Informing citizens whose liberty has been interrupted by a traffic stop that they are free to resume their trip cannot be permitted to be a tactical ploy designed to increase the probability an officer's request for consent to search a vehicle will be granted. If an officer determines there is no basis for continuing a brief investigatory encounter, he or she is authorized to request consent to a vehicle search as part of that encounter. But when, as in this case, an officer unequivocally terminates an encounter and releases the subjects from the scene, their departure cannot be halted by the officer's command to submit to additional questioning, even if that questioning is limited to a request for a vehicle search, in the absence of probable cause for an additional detention.

The State contends that probable cause existed to detain Defendants because of their nervousness, which the officer noted for the videotape record, and the allegedly inconsistent descriptions of where Defendants had been prior to the traffic stop. However, probable cause is not the issue presented in this case, because as noted above there was nothing improper about the officer's decision to make a brief investigation into the cause of the vehicle's weaving in its lane of traffic. The Court found, in essence, that the officer properly evaluated what he learned during his brief investigatory encounter with Defendants and concluded that there was no probable cause to detain them further. It was, however, an improper infringement on Defendants' liberty to command them to interrupt their departure from the scene, because that departure had been authorized by the officer and nothing occurred between it and the officer's order that Defendant Hanson stop and respond to additional questioning.

Order, Camden Superior Court, dated June 30, 1999, filed July 6, 1999.

On appellate review, the evidence is viewed most favorably to upholding the ruling of the trial court. We have held that:

[a]n appellate court reviewing a trial court's order on a motion to suppress evidence must accept the trial court's decisions with regard to questions of fact and credibility unless they are clearly erroneous. The reviewing court must also construe the evidence most favorable to the upholding of the trial court's findings and judgment and must not disturb the findings of the trial judge unless no evidence exists to support them.

(Citation omitted.) Parker v. State, 233 Ga. App. 616, 617 (504 SE2d 774) (1998). See also Tate v. State, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994); Semich v. State, supra at 89; Taylor v. State, 230 Ga. App. 749 (498 SE2d 113) (1998); State v. Corley, 201 Ga. App. 320 (411 SE2d 324) (1991).

The State argues that this court should apply a de novo standard of review in this case because the evidence primarily relied upon is a videotape which this court can view, citing Vansant v. State, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994): "[W]here the evidence is uncontroverted and no question regarding the credibility of witnesses is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review."

Here, the State relies not only upon the videotape, but also upon the deputy's testimony. For example, the deputy testified that he smelled marijuana when he was at the passenger area of the vehicle, but no mention of this is made on the videotape. Also, the deputy issued the warning and released the defendants subsequent to the time he contended at the hearing that he had smelled marijuana. Unlike *Vansant*, this case does involve questions of credibility of the State's witness. *Vansant* has no application on the standard of review where credibility is at issue, because only the trial court can resolve such issue. Issues of the credibility of witnesses are reserved to the trial court in hearings on motions to suppress, and this court has no authority to substitute its judgment for that of the trial judge in such regard. *State v. Jones*, 214 Ga. App. 593 (448 SE2d 496) (1994). Further, a review of the videotape discloses no factual errors by the trial court in any event. The trial court specifically found that the deputy's testimony was not credible. The trial court said: "I don't find it credible that that happened here," and "I don't buy any of that stuff. I don't buy any of it [deputy's explanation] and I don't find it credible."

The court's findings followed several explanations by the deputy which were either contrary to the evidence contained in the videotape, were not supported thereby, or defied logic and common sense. The deputy clandestinely recorded on the videotape his contention that the defendants were very nervous during his interrogation, which conclusion is not supported by a viewing of the videotape.

On the videotape, Deputy Sutton stated that the passenger, Huddleston, was grabbing for her purse when he instructed her to go to the rear of the vehicle. He also testified to this effect at the hearing. A review of the videotape does not support his conclusion or testimony. After several reviews of the videotape, the trial judge stated: "I didn't see her reaching for the purse," and "[t]hat's speculation. . . . I mean, she wasn't anywhere near the purse."

Deputy Sutton testified that he first noticed the smell of marijuana when he talked to Huddleston about the registration and the insurance as she sat in the passenger seat. No mention of this fact appears on the videotape, and he made no inquiry about the marijuana smell even though he asked the passenger approximately a dozen questions during this time, returned to the driver, Hanson, gave him a warning, and subsequently released the defendants. Deputy Sutton could not explain why he did not ask any questions about the marijuana, why he did not record this comment on the videotape, as he had his conclusion that the parties were nervous, or why he released the defendants with a warning only, under such circumstances. At this point, the court found this testimony not to be credible.

Also, Deputy Sutton did not videotape Hanson weaving within

his lane, which he testified was the basis for the stop initially, even though he was following the vehicle and turned the videocamera on immediately prior to stopping the vehicle. A review of the videotape recording the relatively short distance the vehicle was traveling prior to its stop does not reveal any weaving or other suspicious conduct.

A review of the evidence under the required standard reveals that Deputy Sutton testified at the motion to suppress hearing that at 10:40 p.m. on February 17, 1998, he observed a Ford Thunderbird with a Florida license plate weaving within its own lane on I-95, southbound. While the vehicle was not violating any law, Deputy Sutton decided to investigate to determine if the driver was intoxicated or otherwise incapacitated and stopped the vehicle for this purpose.

The vehicle was being driven by Hanson, a long-haired, bearded musician. The videotape of the incident does not disclose the vehicle weaving; it begins shortly before the stop.

The video clearly shows that Deputy Sutton asked Hanson for his driver's license and asked him to step to the rear of his vehicle. Deputy Sutton asked Hanson if he was tired and if he had been drinking, which Hanson denied. It was quickly apparent that Hanson was not incapacitated, and there was no evidence of intoxication. Deputy Sutton confirmed to Hanson that he had broken no law and was not being charged with any violation. He then proceeded, however, to issue a written warning to Hanson even though he had broken no law. Deputy Sutton used the approximately six minutes it took him to write the warning to interrogate Hanson. He asked approximately 40 questions during this period, including such questions as:

> When did y'all leave Largo? Do you have to go to work tomorrow? Where are you coming from? How long were you in Savannah? What's the name of your band? How many members are in your band? Where did y'all play? How long did y'all play there? How long have you been doing that? Does your wife work? What kind of work does she do?

Similar questions were asked of passenger Huddleston when Deputy Sutton questioned her separately from Hanson.

As a justification for stopping Hanson's departure after his release by Deputy Sutton, prosecutor Presswood argued that the driver's license inquiry had not come back at that time. This is clearly untrue as Hanson did not leave until *after* Deputy Sutton returned his driver's license, handed him the warning, and told Hanson he was free to leave.

Prosecutor Presswood also stated that the police were trained in

the technique involved here — that is, using an investigatory stop to attempt to develop probable cause for a search, and where that effort is unsuccessful, stopping the defendant after he has been released and asking for permission to search the vehicle. The presumption being, that at that point, there is a consensual search. The trial court recognized the problem when it inquired of the State:

> How far can you go? [He] hasn't violated any [law] — you just stop [him]. . . . What can you do beyond that? What is reasonable? What is constitutional? What does the law permit you as an officer to do beyond checking and seeing if [he is] drunk, if you stopped [him] because you thought [he] was drunk, even though [he] didn't violate any law? What can you do? Can you ask [him] where [he has] been for the past 24 hours? Can you ask to look in [his] car? Can you ask to search [his] car? How far can you go when there has been no law violated to start with?

May 13, 1999 hearing transcript, p. 83.

While the police are authorized under limited conditions to stop a vehicle where no violation of the law has occurred, they are strictly limited in such investigation to satisfying the basis of their concern. The State is not free to adopt a scheme or pattern of stopping citizens who have not violated the law for the express purpose of seeking permission to search their vehicles. The trial court squarely addressed the problem with the above-described pattern of inquiry at a *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968) stop involving no violation of the law, when she said: "[T]he law is here for everybody's benefit." May 13, 1999 hearing transcript, p. 83.

Constitutional protections are in place for the protection of all citizens against the excesses of government. The great majority of *Terry* stop violations of the type herein involved go undetected and unaddressed, as the vast majority of citizens who are subjected to such stops have violated no law, the searches are not fruitful, and no charge is ever brought, so no judicial review occurs. This in no way diminishes the fact that such searches are unlawful, and their wholesale use should be condemned. Recent history demonstrates how well-intentioned government crime-fighting techniques such as "profiling" have the potential to cause more damage to the public than the conduct they are intended to control. It is the function of the Georgia and United States Constitutions to prevent such excesses.

The State argues that the officer's conduct was authorized under *Williams v. State*, 233 Ga. App. 70, 71 (1) (503 SE2d 324) (1998). *Williams* involved a traffic stop based upon a violation of the traffic laws in the presence of the police officer and is factually distinguishable

from the present case which involved no such violation of the law and was therefore subject to extremely limited police inquiry. In *Williams*, the officer asked for and received permission to search the vehicle where drugs were discovered. Under the totality of these circumstances, the conduct of the police did not exceed the boundaries of a legitimate *Terry* traffic stop. Where the traffic stop is initiated because of an observed violation of Georgia law, the boundaries of *Terry* are broader than where there has been no violation of Georgia law at the time of the stop. In the present case, weaving within a traffic lane was not a violation of Georgia law. See *Terry*, supra. While weaving within one's lane does not generally constitute a traffic offense, it may serve as sufficient reason to warrant an investigative stop for a possible DUI violation, triggering the severe limitations of *Terry*, supra. OCGA § 40-6-48 (1); *State v. Diamond* 223 Ga. App. 164, 166 (477 SE2d 320) (1996); *Semich v. State*, 234 Ga. App. at 89.

Here, we must determine whether the deputy's action was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry*, supra.

> While a reasonable investigative stop does not offend against the Fourth Amendment, a *Terry* stop is subject to strict boundaries regarding duration, intent, and scope. Such a stop has been described by this court as a brief stop, limited in time to that minimally necessary to investigate the allegation invoking suspicion, and limited in scope to identification and limited questioning reasonably related to the circumstances that justified the initiation of the momentary stop.

(Citation omitted.) *Raney v. State*, 186 Ga. App. 758, 759 (368 SE2d 528) (1988).

> In this case, the officer testified that he stopped [Hanson] to investigate a possible DUI violation and not to effect a search for drugs. Under these circumstances, the officer would have been authorized to ask [Hanson] for his license to establish his [identity], and to ask questions reasonably related to whether or not [Hanson] was driving under the influence. In response to such questions, [Hanson] offered a reasonable response. . . . Upon hearing [Hanson's] explanation, the officer would have been authorized to continue asking questions regarding [Hanson's] condition, to administer a statutorily authorized field sobriety test, or take any other reasonable steps to determine whether [Hanson] was . . .

driving under the influence. However, the evidence is uncontroverted that the officer proceeded to ask [Hanson] questions that did not relate to his suspicion that [Hanson] was driving under the influence and that did not relate to any traffic violations, but instead probed into [Hanson's] possession of contraband, specifically [drugs], and culminated in the officer's request to search [Hanson's vehicle]. This later questioning was based on the officer's hunch that [Hanson's vehicle] contained [drugs]. At the point the officer initiated this later probe, he went beyond the permissible scope of the investigation and his further detention of [Hanson] went beyond that permitted by *Terry* and its progeny. "The entire deterrent purpose of the rule excluding evidence seized in violation of the Fourth [A]mendment rests on the assumption that 'limitations upon the fruit to be gathered tend to limit the quest itself.' Thus, evidence may not be introduced if it was discovered by means of a (detention) which (was) not reasonably related in scope to the justification for (its) initiation." (Citations omitted.) [*Terry*], 392 U. S. 1 at 29.

*Smith v. State*, 216 Ga. App. 453, 455 (2) (454 SE2d 635) (1995). This court finds no reversible error in the findings and the ruling of the trial court in this matter.

*Judgment affirmed. Eldridge, J., concurs fully and specially. Barnes, J., concurs specially and in the judgment.*

ELDRIDGE, Judge, concurring specially.

I concur completely with the majority and write only as the author of *Williams v. State*, 233 Ga. App. 70, 71 (1) (503 SE2d 324) (1998), to emphasize why the facts of this case are drastically different from *Williams*. First, in *Williams*, the stop was not under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968), as a reasonable articulable suspicion of DUI or other impairment, but the violation of a traffic law in the officer's presence. See *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994). Second, the delay in completing the *Williams* stop arose from the delay in completing the computer traffic check caused by a common name, regarding the traffic offense. Then, there was further delay from the presence of a pistol in the vehicle, requiring further delay while a computer check was made of the gun. At no time was Williams asked to leave the vehicle prior to the consensual search.

In this case, a *Terry* stop, as soon as the deputy smelled Hanson's breath and observed him after examining his driver's license and insurance card, further questions were outside the scope of the *Terry* stop, unless a new reasonable articulable suspicion had arisen, which

had not occurred prior to the search. At that point Hanson should have been allowed to leave and any request to search should have been made. However, the driver and the passenger were separately questioned, and the driver was removed from the vehicle while the deputy held his driver's license questioning him and stalling by making out a bogus warning. Further, the deputy told him that he could leave but ordered him to stop.

BARNES, Judge, concurring specially.

Because I agree that under the totality of the circumstances the search was unreasonable under the Constitutions of both the United States and Georgia, I concur in the judgment.

I write separately to emphasize that the husband's consent to search the car did not, and could not, extend to the search of the wife's purse that was in her possession and control at the time he consented to the search of her car. A purse is no mere container found in an automobile; it is a uniquely private item containing a person's most confidential possessions. Further, it is an item that is universally recognized as one in which a person has a reasonable expectation of privacy. In this case, the wife's consent to the search of her purse was not sought even though she was present and available to be asked.

When the State attempts:

> to justify a warrantless search on grounds of consent, it has the burden of proving the consent was freely and voluntarily given. Silence in the face of a request for permission to search may sometimes be interpreted as acquiescence, but such acquiescence cannot substitute for free consent. While [Huddleston's] conduct may well have signaled acquiescence [since she did not object], it did not show consent. [Huddleston] was not informed of her right to refuse to consent to a search of her purse[,] and [she] did not give any express consent.

(Citations omitted.) *State v. Harris*, 236 Ga. App. 525, 529 (2) (b) (ii) (513 SE2d 1) (1999). Therefore, I also would find that the deputy was not authorized to search Huddleston's purse based upon the consent to search the car given by Hanson. Id.

ON MOTION FOR RECONSIDERATION.

On motion for reconsideration, the State erroneously contends that the opinion is in error at page 539, when it states:

> [a]s a justification for stopping Hanson's departure after his release by Deputy Sutton, prosecutor Presswood argued that

the driver's license inquiry had not come back at that time. This is clearly untrue as Hanson did not leave until *after* Deputy Sutton returned his driver's license, handed him the warning, and told Hanson he was free to leave.

State's motion for reconsideration April 6, 2000.

The transcript of the hearing reveals the following:

Mr. Presswood: Your Honor, we expect the evidence to show that the report back from the 911 center as to whether the license was valid or not did not come until after the consent was obtained to search the vehicle. And so, therefore. . . .

Mr. Kadish: Excuse me, Your Honor. That's an incorrect statement. . . .

The Court: I thought it had all come back. I thought —

Mr. Kadish: He even had let them go.

The Court: He'd given the man his license and he had let the man go.

Mr. Kadish: Of course. He was — they had gotten the license report back and he told him to go to his car.

The Court: And he put his hand on the car. That's true. He put his — you're right. You're absolutely right. He put his hand on the car. He was getting in the car to leave before he asked him, then, to search. He was on the way out. To me, that was caput. That was the end of it.

Mr. Kadish: Correct.

The Court: Nothing else should have ever happened. . . . Mr. Presswood, why would he continue? . . . You're going to let him drive. He's going to drive. He hasn't violated any laws. There's no showing of any illegal violations. You give him his license back, you tell him to leave and then you stop him again? For what reason?

Mr. Presswood: Your Honor, *I would also expect the evidence to show that Sergeant Sutton has been trained in this technique*, or even come up with this technique, under the impression that once you let a person go off a traffic stop and you ask them, "Do you mind if I ask you a few questions?" that then you're in a consensual situation.

(Emphasis supplied.) May 13, 1999 hearing transcript, pp. 74-76. *Motion for reconsideration denied.*

DECIDED MARCH 27, 2000 —
RECONSIDERATION DENIED APRIL 13, 2000.

*Stephen D. Kelley, District Attorney, James J. Presswood, Jr., Assistant District Attorney,* for appellant.
*James J. McGinnis, Mark J. Kadish,* for appellees.