S03G1172. DANIEL v. THE STATE.
(597 SE2d 116)

HUNSTEIN, Justice.

James Henry Daniel was convicted of trafficking in cocaine based on evidence found pursuant to a consent search of the vehicle Daniel was driving after he was stopped for a routine traffic offense. On appeal Daniel did not contest the legality of the initial traffic stop but instead argued that the officer improperly expanded the scope of the stop and that Daniel's consent to search was the coerced result of an illegal seizure. Relying upon *State v. Sims*, 248 Ga. App. 277 (546 SE2d 47) (2001), the Court of Appeals rejected Daniel's arguments. *Daniel v. State*, 260 Ga. App. 732 (580 SE2d 682) (2003). We granted certiorari to address whether, in light of *Padron v. State*, 254 Ga. App. 265 (562 SE2d 244) (2002) and *State v. Hanson*, 243 Ga. App. 532 (532 SE2d 715) (2000), the Court of Appeals correctly upheld the denial of Daniel's motion to suppress.

---

[5] We note that no juror complained to the trial court about any inability to see appellant.

1. The Fourth Amendment protects against unreasonable searches and seizures, including seizures that involve only a brief detention. *United States v. Mendenhall*, 446 U. S. 544, 551 (100 SC 1870, 64 LE2d 497) (1980). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U. S. 806, 809-810 (116 SC 1769, 135 LE2d 89) (1996). An investigative detention usually must "last no longer than is necessary to effectuate the purpose of the stop," and the "scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U. S. 491, 500 (103 SC 1319, 75 LE2d 229) (1983) (plurality opinion).

> [T]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. See *Royer*, [supra,] 460 U. S. at 500.

*Ferris v. Maryland*, 735 A2d 491, 499 (Md. 1999). See also *Padron v. State*, supra, 254 Ga. App. at 268; *State v. Hanson*, supra, 243 Ga. App. at 540-541.

Once the underlying basis for the initial traffic stop has concluded, it does not automatically follow that any further detention for questioning is unconstitutional. Fourth Amendment jurisprudence has clarified that

> [l]engthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. [Cit.] Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter. [Cit.]

*United States v. Hunnicutt*, 135 F3d 1345, 1349 (10th Cir. 1998); *United States v. Pruitt*, 174 F3d 1215, 1220 (11th Cir. 1999). Accord *Ohio v. Robinette*, 519 U. S. 33 (117 SC 417, 136 LE2d 347) (1996). Thus, we hold that a law enforcement officer's continued questioning of a vehicle's driver and passengers outside the scope of a valid traffic stop passes muster under the Fourth Amendment either when the officer has a reasonable articulable suspicion of other illegal activity

or when the valid traffic stop has de-escalated into a consensual encounter.

2. Where, as here, law enforcement officers lack a reasonable suspicion of criminal activity to justify further detention beyond the scope of the initial traffic stop, the question becomes whether the traffic stop evolved into a consensual police-citizen encounter not implicating the Fourth Amendment.[1] See *State v. Sims*, supra, 248 Ga. App. at 278. See also *Utah v. Hansen*, 63 P3d 650, 660 (Utah 2002).

> A consensual encounter has been defined as simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official. Because an individual is free to leave at any time during such an encounter, he is not "seized" within the meaning of the fourth amendment. [Cits.]

*Ferris*, supra, 735 A2d at 500, fn. 4.

The test for determining if a particular encounter constitutes a seizure within the meaning of the Fourth Amendment is whether " 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' [Cit.]" *Michigan v. Chesternut*, 486 U. S. 567, 573 (108 SC 1975, 100 LE2d 565) (1988). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Mendenhall*, supra, 446 U. S. at 554. There is no "litmus-paper test for distinguishing a consensual encounter from a seizure," *Royer*, supra, 460 U. S. at 506, and the test is

> necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at

---

[1] Mere police questioning does not constitute a seizure for Fourth Amendment purposes. *Florida v. Bostick*, 501 U. S. 429, 434 (111 SC 2382, 115 LE2d 389) (1991). Rather, "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Id. In the absence of a seizure, a police-citizen encounter is considered consensual and "will not trigger Fourth Amendment scrutiny." Id. See also *Palmer v. State*, 257 Ga. App. 650, 652 (1) (572 SE2d 27) (2002) (communications between police and citizens involving no coercion or detention are outside the domain of the Fourth Amendment).

issue, but also with the setting in which the conduct occurs.

*Chesternut*, supra at 574.

Accordingly, the courts must look to the totality of the circumstances in determining whether a reasonable person would have felt free to leave. *Florida v. Bostick*, 501 U. S. 429, 437 (111 SC 2382, 115 LE2d 389) (1991); *State v. Sims*, supra, 248 Ga. App. at 278-279. See also *Pennsylvania v. Freeman*, 757 A2d 903 (Pa. 2000). Courts have identified numerous factors as probative to that assessment. A non-exhaustive list of such factors includes:

> the existence and nature of any prior seizure; whether there was a clear and expressed endpoint to any such prior detention; the character of police presence and conduct in the encounter under review (for example — the number of officers, whether they were uniformed, whether police isolated subjects, physically touched them or directed their movement, the content or manner of interrogatories or statements, and "excesses" factors stressed by the United States Supreme Court); geographic, temporal and environmental elements associated with the encounter; and the presence or absence of express advice that the citizen-subject was free to decline the request for consent to search. In general, a full examination must be undertaken of all coercive aspects of the police-citizen interaction. [Cit.]

Id. at 906-907. See also *Ferris*, supra, 735 A2d at 502; *South Carolina v. Williams*, 571 SE2d 703, 708 (S.C. App. 2002).[2]

The U. S. Supreme Court has made it clear that no single factor dictates whether a seizure has occurred. *Bostick*, supra, 501 U. S. at 437. Bearing this in mind, we address three of these factors that have been given particular scrutiny by foreign courts that have analyzed this issue.

(a) First, the return of driver's licenses and other legal documents by law enforcement officers to the documents' owners is a well-recognized threshold factor. We agree with those courts that have held that "an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him. [Cit.]" *United States v. Gonzalez-Lerma*, 14 F3d 1479, 1483 (10th Cir.

---

[2] The absence of certain coercive factors at the time of the additional questioning is not persuasive where those factors were absent at the time of the initial seizure. "Since these factors were never present to begin with, a reasonable person would not be able to discern that a seizure had de-escalated to a consensual encounter due to the absence of such factors at the time of additional questioning." *Hansen*, supra, 63 P3d at 662.

1994).[3] See also *Faulkner v. State*, 256 Ga. App. 129 (567 SE2d 754) (2002) (encounter not consensual where questioning began before driver was given his copy of traffic ticket containing citation details).

However, "[a]lthough an officer must return a driver's documentation before a detention can end, the return of the driver's documentation is not always sufficient to demonstrate that an encounter has become consensual. [Cit.]" *Colorado v. Cervantes-Arredondo*, 17 P3d 141, 148 (Col. 2001). Accord *Ferris*, supra, 735 A2d at 505 (" '[g]iven the fact that (the driver) quite clearly had been seized when his car was pulled over, the return of (his) credentials hardly manifests a change in status when it was *immediately* followed by interrogation concerning other criminal activity.' [Cit.]").[4] Accordingly, we emphasize that the return of documents does not conclusively establish that a traffic stop has de-escalated into a consensual encounter.

(b) A second significant factor is whether the officer informed the citizen that he or she was free to leave. It is well established that an officer is not required under the Federal Constitution to advise the driver that he is "free to go" after a valid detention before the officer attempts to engage in a consensual interrogation. *Robinette*, supra, 519 U. S. at 39. However, the U. S. Supreme Court reiterated that such advice was one factor to consider in determining whether consent to search was voluntary. Id. See also *Ferris*, supra, 735 A2d at 504 (discussing other courts that "similarly have recognized that the failure by law enforcement to inform a citizen that he or she is free to terminate the encounter is a significant factor suggesting a contin-

---

[3] The Tenth Circuit has recognized that the underpinning of this bright-line rule is twofold. First, because the law requires a driver to be in possession of a valid license and other documentation, the driver cannot legally drive away without those items. Secondly,
a bright-line rule also facilitates proper compliance by law enforcement officers; if the officer knows that an encounter cannot be deemed consensual unless the driver's documents have been returned, there will be less confusion over whether further questions may be asked and what subjects they may cover.
*United States v. Soto*, 988 F2d 1548, 1557 (10th Cir. 1993).

[4] As the Pennsylvania Supreme Court has noted,
there is some coercive aspect even in non-detentive interactions between law enforcement officers and citizens. . . . This element of coercion is obviously enhanced when police actually detain a citizen, albeit lawfully, for some period of time, by means of a traffic or similar stop. . . . [T]his coercive effect is not necessarily entirely dispelled merely because a law enforcement officer returns the citizen's driver's documentation or otherwise accomplishes the purpose of the detention. While . . . the mere existence of such an effect is not, in and of itself, a sufficient basis to support the finding of a seizure, [cit.], the degree of coercion applied in the prior encounter will affect the weight to be assigned to this factor in the overall totality assessment. Centrally, we are unable to discount the fact that there remains at work some pertinent psychological dynamic based upon the relative positions of authority as between the officer and a citizen-subject, and an immediately-preceding exercise of the officer's authority, and conclude that courts would be ill advised to ignore such dynamic in the totality assessment. [Cit.]
*Pennsylvania v. Strickler*, 757 A2d 884, 898 (Pa. 2000).

ued seizure under the Fourth Amendment").

We emphasize that under the totality of the circumstances analysis, an officer's failure to advise a motorist that he or she is free to leave does not by itself determine whether a seizure has occurred. However, the obverse is also accurate: an officer's express statement that the motorist is free to leave does not by itself mean that the ensuing encounter is consensual. We recognize that even after a driver has been expressly advised that he or she is free to leave, an officer's subsequent actions may be so inconsistent with that advice that a reasonable person could conclude that the advice was no longer operative. See, e.g., *United States v. Beck*, 140 F3d 1129, 1135-1136 (8th Cir. 1998); *Freeman*, supra, 757 A2d at 906; *Rettinger v. Virginia*, 532 SE2d 25 (IV) (Va. 2000).

(c) The third and related significant factor involves the citizen's appreciation that the traffic stop has reached an endpoint. As other jurisdictions have recognized,

> [t]he moment at which a traffic stop concludes is often a difficult legal question, not readily discernible by a layperson. It is not sound to categorically impute to all drivers the constructive knowledge as to the precise moment at which, objectively, an initially lawful traffic stop terminates, i.e., the time at which the driver may depart.

*Ferris*, supra, 735 A2d at 503. See also *Robinette*, supra, 519 U. S. at 41 (Ginsburg, J., concurring) (" '[m]ost people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him' "). This factor is especially pertinent, given that

> [t]he transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.

*Williams*, supra, 571 SE2d at 709. Accord *State v. Hanson*, supra, 243 Ga. App. at 534 (a traffic stop "must have a distinct ending point which is ascertainable to both the officers charged with enforcing the law and the citizens whom they encounter").

Finally, we emphasize that in analyzing whether, under the

totality of the circumstances, an occupant of a vehicle believes he or she is free to leave, it is important to remember that

> a traffic stop followed by a request for consent to search is not made up of two separable contacts, but one interaction in distinct phases. [Cit.] They are part of the same continuous contact, which begins with a routine traffic stop. [Cit.] Accordingly, an extended contact must be reviewed by considering the facts and circumstances that gave rise to the initial stop plus any additional information learned by the officer before issuing a warning or citation. [Cit.] The duration and conditions of the contact must be viewed in the context of the entire stop. [Cit.]

*Cervantes-Arredondo*, supra, 17 P3d at 147-148.

3. "Since a consensual encounter is not a seizure, questioning during such an encounter is lawful, regardless of scope, as long as the person remains a willing participant. [Cits.]" *Hansen*, supra, 63 P3d at 661. "[I]f the consent is voluntary, an officer may obtain consent to search a car following the conclusion of a valid traffic stop, without reasonable suspicion of criminal activity. [Cit.]" *State v. Sims*, supra, 248 Ga. App. at 279. The voluntariness of a consent to search given by the occupant of a vehicle during a consensual police-citizen encounter is determined based upon the totality of the circumstances. See *Schneckloth v. Bustamonte*, 412 U. S. 218, 227 (93 SC 2041, 36 LE2d 854) (1973). Voluntariness must reflect an exercise of free will, not merely a submission to or acquiescence in the express or implied assertion of authority. See *California v. Hodari D.*, 499 U. S. 621, 626 (111 SC 1547, 113 LE2d 690) (1991); *Beasley v. State*, 204 Ga. App. 214, 216 (1) (419 SE2d 92) (1992). The subjective intent of the officer in requesting the search is relevant to a determination of the consent's voluntariness "only to the extent that that intent has been conveyed to the person confronted." *Chesternut*, supra, 486 U. S. at 575, n. 7. See *Robinette*, supra, 519 U. S. at 38 (the "subjective intentions of the officer did not make the continued detention of respondent illegal under the Fourth Amendment").

Even where the driver and vehicle occupants have been illegally detained, the driver or owner of the vehicle may nonetheless voluntarily consent to a search of the vehicle. " 'The government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal (detention).' [Cits.]" *United States v. McSwain*, 29 F3d 558, 562 (10th Cir. 1994). See also *Hansen*, supra, 63 P3d at 663 (III) (A) (2). As we have recently held, in those instances where an individual is illegally seized, searched or arrested, any consent obtained thereafter must be analyzed to deter-

mine both whether the consent was given voluntarily (under the totality of the circumstances test) and whether that consent was sufficiently attenuated from the unlawful seizure so that it was not the product thereof. *State v. Poppell*, 277 Ga. 595 (592 SE2d 838) (2004). In determining whether the consent was not the result of police exploitation of the prior illegality, the relevant factors to be considered include "the temporal proximity of an illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct. . . . [Cit.]" Id. at 597. See also *Tennessee v. Garcia*, 123 SW3d 335 (Tenn. 2003); *Hansen*, supra at 665 (III) (B). Accord *Brown v. Illinois*, 422 U. S. 590, 603-604 (95 SC 2254, 45 LE2d 416) (1975). Unlike the situation in consensual encounters, an officer's subjective intent may be relevant to an assessment of the misconduct factor. See id. at 605; *Tennessee v. Huddleston*, 924 SW2d 666, 676 (Tenn. 1996). See also *United States v. Fernandez*, 18 F3d 874, 883 (10th Cir. 1994) (officer's beliefs and vague hunches relevant to third *Brown* factor).

4. We granted Daniel's petition for certiorari to consider his appeal in light of two Court of Appeals' opinions. In *Padron*, supra, 254 Ga. App. at 265, the Court of Appeals reversed the denial of suppression motions filed by Padron and her husband, Cabrera, where one of the officers who conducted the stop testified that the two defendants were not "free to leave" after he returned Cabrera's driver's license even though the officers did not have a reasonable suspicion of criminal activity. Id. at 267 (1). Further, while Cabrera may have initially consented to a search of the vehicle, the undisputed facts showed that he protested when the officers sought to open a suitcase in the trunk, thereby withdrawing his consent to the search, id. at 270, but that the officers disregarded his objections and repeatedly ordered him to stand back. The officers having uncovered nothing in the consensual aspect of the vehicle search to provide a reasonable suspicion of criminal activity and the voluntary consent to search having been withdrawn as to the suitcase, the detention of Padron and her husband was illegal and the Court of Appeals correctly concluded that the trial court should have suppressed the fruits of the search.

In *Hanson*, supra, 243 Ga. App. at 532, the trial court found that although the law enforcement officer returned Hanson's license and told Hanson and his co-defendant that they were free to go, the officer then "directed" Hanson to "halt his departure from the scene" just as Hanson reached for his car's door handle. Id. at 533. Because the officer lacked any reasonable articulable suspicion to detain the defendants and their detention was lengthened not because they voluntarily consented to remain but because the officer's direction to Hanson was inconsistent with his advice that the men were free to

go, the Court of Appeals correctly affirmed the trial court's ruling holding the detention illegal and suppressing the fruits of the officer's search.

Reviewing the Court of Appeals' opinions in *Padron* and *Hanson*, supra, in light of the principles set forth supra, we conclude that these opinions reached conclusions consistent with our analysis of the law applicable to these types of search and seizure cases.

5. In the case before us, the evidence adduced reflected the following pertinent facts.[5] Daniel, accompanied by Dawson and another passenger, was driving an Impala Chevrolet when Henry County Police Officer Scott Ryals, driving a marked police car, stopped him around 10:00 p.m. on December 14, 1994. The reason for the stop was that the car was weaving out of its lane. Daniel gave the uniformed officer the name of "Marlin Sheffield" and claimed he did not have his license and proof of insurance with him; Dawson, the front seat passenger, had his license. The men remained at the Impala as the officer returned to his cruiser and checked through computer records. A Hampton police officer drove up in his patrol car around this time, but other than conversing with Officer Ryals the Hampton officer did not participate in the traffic stop.

After determining that both "Marlin Sheffield" and Dawson had valid licenses, Officer Ryals issued Daniel a warning citation and returned to Daniel all of the documents he had received (including the passenger's license). The officer then advised Daniel that he could let Dawson drive the car away and that the men were free to leave. Officer Ryals and Daniel were standing at the rear of the Impala at this time. Daniel walked over toward the passenger side of the Impala. When Daniel was 10 to 15 feet away, Officer Ryals asked him, "do you mind if I ask you a question?" Daniel responded "sure" and returned to the officer. Officer Ryals again advised Daniel that he was free to leave with just the warning, but that the officer would like to talk with him. Daniel said nothing in response to the officer's comments but continued to stand and listen. The officer then asked a few questions about where Daniel was going; explained about the problem with narcotics coming into the Atlanta area; and asked Daniel if he would consent to a search of the car. Daniel agreed. During a consensual pat-down of Dawson and another passenger in the Impala the officer discovered a lump of crack cocaine in Dawson's pocket. A search of the car thereafter revealed 1.6 ounces of crack cocaine under the driver's seat.

The trial court, in its ruling announced from the bench during the motions hearing, found that the initial stop was valid, that it was

---

[5] A more detailed recital of the facts is presented in *Daniel*, supra, 260 Ga. App. at 732.

not pretextual, and that the stop did not exceed the scope authorized by *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). The trial court then properly assessed whether the post-stop contact between Daniel and Officer Ryals evolved into a consensual encounter. The trial court had before it the location and time of the stop; the routine manner in which the stop was conducted by a uniformed officer[6] in a marked patrol car; the officer's return of documents, issuance of the warning, and explicit advisement that Daniel was free to go and that Dawson could drive the Impala; the distance between the officer and Daniel and the time gap before the officer inquired whether he could ask Daniel questions; the return by Daniel to the officer without any order or direction by the officer; the absence of any immediate interrogation and the officer's repetition of advice that Daniel could leave with the warning citation; and the non-investigative questions followed by the explanation of problems with narcotics in the area before the officer requested Daniel's permission to search the Impala. From this evidence the trial court concluded that the post-stop contact was a "valid consensual encounter" because Daniel had "a clear understanding" that he was free to go and that he was not under any compulsion to remain or to obey the officer's request. The trial court denied the motion to suppress on the basis that Daniel voluntarily consented to the officer's request to search.

In reviewing a trial court's decision on a motion to suppress where the evidence was uncontroverted and no question regarding the credibility of witnesses was presented, an appellate court must conduct a de novo review of the trial court's application of law to the undisputed facts. *Hughes v. State*, 269 Ga. 258 (1) (497 SE2d 790) (1998). See also *Green v. State*, 275 Ga. 569, fn. 11 (570 SE2d 207) (2002). Although the Court of Appeals failed to conduct the appropriate de novo review, we conclude that the trial court did not err in its application of the law to the undisputed facts of record in this case when it denied Daniel's motion to suppress. Accordingly, the Court of Appeals did not err by affirming Daniel's conviction for trafficking in cocaine.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 24, 2004.

*Lloyd J. Matthews*, for appellant.

---

[6] Officer Ryals testified that he was in his "prowl unit" uniform, consisting of fatigues and boots, rather than the formal uniform of blue shirt, slacks and hat.

Tommy K. Floyd, District Attorney, James L. Wright III, Assistant District Attorney, for appellee.