**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 29, 2021**

# In the Court of Appeals of Georgia

A21A0264. HILL v. THE STATE.

DOYLE, Presiding Judge.

In this interlocutory appeal, Thomas Hill appeals from the denial of his motion to suppress evidence obtained during a traffic stop pursuant to a search after he gave police consent. He contends that the trial court erred because his consent to the police officer's search of his vehicle was not voluntary, arguing that the officer's request for consent occurred while a reasonable person would have believed he was still detained. Therefore, he argues, his consent was not voluntary, and the request to search was an unauthorized extension of the traffic stop. Based on the facts of this case, we agree and reverse.

When the facts material to a motion to suppress are disputed, it generally is for the trial judge to resolve those disputes and determine the material facts. This principle is a settled one, and [the Supreme]

Court has identified three corollaries of the principle, which limit the scope of review in appeals from a grant or denial of a motion to suppress in which the trial court has made express findings of disputed facts. First, an appellate court generally must accept those findings unless they are clearly erroneous. Second, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court. And third, an appellate court generally must limit its consideration of the disputed facts to those expressly found by the trial court.[1]

Viewed in this light, the evidence at the suppression hearing,[2] shows that in October 2017, Corporal Colt Young, a sheriff's deputy, was on patrol when he observed Hill driving a black 2004 Acura at an excessive speed, clocking Hill on his police radar at 87 miles per hour in a 55 mile per hour zone. Young performed a u-turn, activated his emergency lights, and pursued Hill, who pulled over shortly

---

[1] (Citations and punctuation omitted.) *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015). See also *Tate v. State*, 264 Ga. 53, 56 (3) (440 SE2d 646) (1994) ("Credibility of witnesses and the weight to be given their testimony is a decision-making power that lies solely with the trier of fact. The trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony.").

[2] The evidence consisted of testimony from the arresting officer and radio dispatch supervisor, a computer-aided dispatch report, and phone logs. Due to a problem in the video storage system, there was no dash camera or body camera recording of the stop available at the time of the suppression hearing.

thereafter. Young informed dispatch that he was executing a traffic stop at 12:44 p.m., and by 12:46 p.m., Young had made contact with Hill on the side of the road.

As Hill sat in his vehicle, Young told him that he had pulled him over for speeding and requested Hill's driver's license. Hill complied, and Young noticed that Hill was breathing heavily, he could see Hill's heartbeat through his shirt, and Hill would not make eye contact. Young asked Hill if he was ok, and Hill replied that "he was just worried about how much the ticket [would] cost." Young took Hill's license and registration back to his police cruiser and radioed the driver's license and vehicle tag information to dispatch to check the validity and to determine if Hill had any outstanding warrants. Young did not have a computer in his cruiser at that time, so he relied on dispatch to check Hill's license and registration information. Also at that time, Young called for any nearby officers to provide backup due to Hill's apparent nervousness. Two minutes later, at 12:48 p.m., Sergeant Scottie Waldrip responded that he was en route to meet Young.

As Young communicated with dispatch from his cruiser, he realized that there was a discrepancy in the registration information that dispatch was giving him about the make and year of the vehicle driven by Hill. Due to static in the radio communications, dispatch eventually communicated with Young by cell phone, and

3

by 12:57 p.m. it was determined that dispatch had entered the wrong tag number, and the discrepancy had been resolved.

As Young finished writing the citation in his cruiser, Sergeant Waldrip arrived at 12:59. Once Young was finished writing the citation a few minutes later,[3] he approached Hill's vehicle and asked him to exit and stand at the back of his vehicle. Hill complied, and Young patted him down to determine the presence of any weapons. Finding none, Young then explained the citation to Hill, advised him of his court date, and handed him the citation along with his license and registration. At that point, Young considered the traffic stop to be over, but he did not expressly tell Hill that he was free to leave. Immediately after handing Hill the citation and his license, Young asked Hill "if there was anything illegal inside the vehicle." Hill replied, "no," and then Young asked Hill if he could search Hill's vehicle, and Hill replied, "go ahead."

Young searched Hill's vehicle and discovered a plastic bag containing approximately 28.3 grams of a white powder he suspected to be cocaine; at 1:07 p.m.,

---

[3] It is not clear from the record exactly when Young finished writing the citation and re-engaged Hill. It is undisputed that the entire stop took 23 minutes from the time Young pulled Hill over to the time Young was arrested.

he radioed dispatch to report that he was detaining Hill while he field tested the substance. Two minutes later, after receiving a positive result for cocaine, Young arrested Hill at 1:09 p.m.

Hill was indicted for trafficking in cocaine, possessing cocaine with intent to distribute, and speeding. He moved to suppress the evidence from the traffic stop, which motion was denied (as was a renewed motion), and the trial court issued a certificate of immediate review. This Court granted Hill's application for interlocutory review.

1. Hill contends that the trial court erred because his alleged consent to the search was not voluntarily given at a time when a reasonable person would have appreciated that the roadside encounter had become consensual. Based on the record before us, we agree.

We begin with the Fourth Amendment principles relevant to the traffic stop. As the United States Supreme Court has clarified,

> [a] seizure for a traffic violation justifies a police investigation of that violation. . . . Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed. . . . Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining

5

whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. [Further,] traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. On-scene investigation into other crimes, however, detours from that mission.[4]

Thus, "[o]nce the purpose of [the traffic] stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention."[5] "The United States Supreme Court has held unequivocally that the Fourth Amendment does not

---

[4] (Citations and punctuation omitted.) *Rodriguez v. United States*, 575 U. S. 348, 354-356 (II) (135 SCt 1609, 191 LEd2d 492) (2015).

[5] (Punctuation omitted.) *Salmeron v. State*, 280 Ga. 735, 736, 738 (1) (632 SE2d 645) (2006), quoting with approval *Daniel v. State*, 277 Ga. 840, 841 (1) (597 SE2d 116) (2004) and overruling *Daniel* to the extent that it conflicted with U. S. Supreme Court precedent, *Muehler v. Mena*, 544 U. S. 93 (125 SCt 1465, 161 LE2d 299) (2005) (holding that "unless the detention was prolonged by the questioning, there is no additional seizure within the meaning of the Fourth Amendment.") (punctuation omitted). See generally *Daniel*, 277 Ga. at 841-842 (1) ("Once the underlying basis for the initial traffic stop has concluded . . . a law enforcement officer's continued questioning of a vehicle's driver and passengers outside the scope of a valid traffic stop . . . [must be based on] a reasonable articulable suspicion of other illegal activity or [occur] when the valid traffic stop has de-escalated into a consensual encounter."). See also *State v. Felton*, 297 Ga. App. 35, 37 (676 SE2d 434) (2009) ("It is well settled that if the officer continues to detain the subject after the conclusion of the traffic stop and interrogates him or seeks consent to search without reasonable suspicion of criminal activity, the officer has exceeded the scope of a permissible investigation of the initial traffic stop.") (punctuation omitted).

allow even a de minimis extension of a traffic stop beyond the investigation of the circumstances giving rise to the stop."[6] "It is the unsupported additional detention, not police questioning, which constitutes the Fourth Amendment violation."[7]

With respect to a consensual search arising from a traffic stop, "[t]he State bears the burden of proving that a defendant's consent to search is valid — i.e., that it was given freely and voluntarily."[8] To determine whether an authorized detention has de-escalated into a consensual encounter, such that consent to search is voluntarily given, the inquiry is an objective one, which we review de novo.[9] "The appropriate inquiry is whether a reasonable person would feel free to decline the

---

[6] *State v. Drake*, 355 Ga. App. 791, 793 (1) (845 SE2d 765) (2020), citing *Rodriguez*, 575 U. S. at 356-357 (II).

[7] (Punctuation omitted.) *Felton*, 297 Ga. App. at 37.

[8] *Drake*, 355 Ga. App. at 795 (1).

[9] See *Davis v. State*, 306 Ga. App. 185, 188 (2) (702 SE2d 14) (2010). See also *Terry v. State*, 358 Ga. App. 195, 201 (1) (854 SE2d 366) (2021) ("[A] trial court's conclusion that 'a traffic stop was unreasonably prolonged may often be a fact-intensive determination, but it is ultimately a holding of constitutional law that we review de novo.'"); *State v. Depol*, 336 Ga. App. 191, 192 (784 SE2d 51) (2016) ("Although we owe substantial deference to the way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts. This includes legal determinations based upon the totality of the circumstances.") (citation and punctuation omitted).

officers' request to search or otherwise terminate the encounter. Mere acquiescence to the authority asserted by a police officer cannot substitute for free consent."[10]

Various courts have recognized a number of circumstances that bear on whether a reasonable person would have felt free to leave, including:

> the existence and nature of any prior seizure; whether there was a clear and expressed endpoint to any such prior detention; the character of police presence and conduct in the encounter under review ([e.g.,] the number of officers, whether they were uniformed, whether police isolated subjects, physically touched them or directed their movement, the content or manner of interrogatories or statements, [etc.]); geographic, temporal and environmental elements associated with the encounter; and the presence or absence of express advice that the citizen-subject was free to decline the request for consent to search.[11]

"The voluntariness of consent is determined by the totality of the circumstances; no single factor controls."[12]

---

[10] (Punctuation omitted.) *Batten v. State*, 341 Ga. App. 332, 334-335 (a) (801 SE2d 57) (2017).

[11] (Punctuation omitted.) *State v. McMichael*, 276 Ga. App. 735, 737-738 (1) (624 SE2d 212) (2005).

[12] (Punctuation omitted.) *Batten*, 341 Ga. App. at 334-335 (a).

Here, the dispositive facts are undisputed, and we accept the trial court's findings as adequately supported by the record. Those facts show that after Hill was pulled over, Young called in a second officer to be present at the scene due to Young's belief that Hill was engaged in criminal activity based on Hill's nervousness. As Hill waited in his vehicle for Young to complete the tasks associated with the traffic stop (calling dispatch, checking the validity of his license and vehicle registration, and writing the citation), a second officer arrived and remained on the scene, communicating briefly with Young.[13] When Young approached Hill to hand him the citation, he requested that Hill exit the vehicle and stand with him at the rear of the vehicle with the second officer nearby. Then Young patted down Hill to search for weapons. Although requesting Hill to exit his vehicle and pat him down ordinarily would not exceed Young's authority to conduct the traffic stop,[14] Young candidly

---

[13] Young's memory of this interaction was poor. He testified that he would have spoken briefly with the second officer about the circumstances, but there is no evidence that the communications materially prolonged the encounter.

[14] See *Rodriguez*, 575 U. S. at 356 (II) (noting holding in *Pennsylvania v. Mimms,* 434 U. S. 106, 110-111 (98 SCt 330, 54 LEd2d 331) (1977), approving the practice of having drivers exit their vehicle as part of a routine traffic stop on the ground of officer safety). Notably, the scenario addressed in *Mimms* is having a driver exit the vehicle while briefly detained as the officer performs the checks and other tasks related to issuing a citation. Here, Young asked Hill to exit his vehicle after performing all of the tasks of the stop, only asking him to exit his vehicle so that he

9

testified that he did so at the end of the stop because he was "trying to determine if something else was going on other than speeding." Young was transparent about the fact that from the moment he initially encountered Hill, he believed "there was possibly another crime afoot." The Supreme Court of Georgia has, at least in dicta, recognized the nuance here: "a marginally burdensome inquiry that promotes the officer's safe completion of the traffic-stop mission, *and is not done merely to facilitate a detour into some non-mission related task*, is a permissible part of the traffic stop."[15] We do not (and cannot)[16] hold that the mere act of asking Hill to exit his vehicle actually exceeded Young's authority, but it does inform the totality of the circumstances that ensued, particularly in light of the delayed timing of asking Hill to exit his vehicle, the pat-down, and the arrival and presence of a backup officer on

could hand him his license and the citation.

[15] (Emphasis supplied.) *State v. Allen*, 298 Ga. 1, 8 (2) (c) (779 SE2d 248) (2015).

[16] See *Ohio v. Robinette*, 519 U. S. 33, 38 (117 SCt 417, 136 LEd2d 347) (1996) ("Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis. And there is no question that, in light of the [authority] to stop [the defendant] for speeding, [the officer] was objectively justified in asking [the defendant] to get out of the car, subjective thoughts notwithstanding.") (citations and punctuation omitted).

10

the scene.[17] Nothing up to that point indicated to Hill that the stop was de-escalating; instead, the circumstances objectively indicated the opposite.

Then, after speaking to Hill and explaining the citation and handing him his license and paperwork, rather than telling Hill that he was free to leave or otherwise disengaging with him, Young asked "if there was anything illegal inside the vehicle." At the suppression hearing, Young readily conceded that at that point in the stop he had no reason to detain Hill, but he nevertheless continued to engage him, asking about the presence of contraband and requesting consent to search the vehicle.[18]

Based on the totality of the circumstances — including the arrival of backup, the timing of being asked to exit the vehicle, the pat-down, and not being told that he

---

[17] See generally *Allen*, 298 Ga. at 10 (2) (c) (weighing the relative intrusiveness of waiting for a records check in a personal vehicle compared to being asked to exit the vehicle and noting that "many people would find providing their identification to a police officer for a computer records check far less intrusive than being ordered out of the car to stand on the shoulder of a busy highway or on the side of a street in their neighborhood").

[18] "The only possible reason for suspicion about drug possession given by [Young] is that [Hill] was nervous during the stop. But as this Court has explained, mere nervousness is not sufficient to support a reasonable articulable suspicion to extend a stop after completion of the original mission." *Weaver v. State*, 357 Ga. App. 488, 491 (851 SE2d 125) (2020). See also *Gonzales v. State*, 255 Ga. App. 149, 150 (564 SE2d 552) (2002) ("nervousness alone is not sufficient to establish reasonable suspicion to detain and investigate for illicit drug activity").

11

was free to leave despite the conclusion of the traffic stop — a reasonable person would not have understood that he was free to leave at the time that Young inquired about illegal items in the vehicle and requested consent to search Hill's vehicle.[19] Although

> an officer is not required to advise the driver that he is "free to go" before a consent to search will be recognized as voluntary. . . , [t]he moment at which a traffic stop concludes is often a difficult legal question, not readily discernible by a layperson. It is understandable that

---

[19] See *Felton*, 297 Ga. App. at 37 ("It was evident that even after the traffic stop ended the men were not free to go because the officer had the driver exit the car before giving him the citation, and at that point asked him for consent to search."); *Gonzalez*, 255 Ga. App. at 149 (reversing the grant of a motion to suppress because "a reasonable person would not have felt free to disregard the police and go about her business"). Compare pre-*Rodriguez* cases *Davis*, 306 Ga. App. at 187 (1) ("Davis remained on the scene and engaged in casual conversation about the high level of drug activity in the area and the fact that she worked nearby. Her conduct showed that she did not feel intimidated by the officer's presence. Under the circumstances, the initial traffic stop had de-escalated into a consensual encounter."); *Davis v. State*, 303 Ga. App. 785, 787 (694 SE2d 696) (2010) (trooper's request to search did not unreasonably prolong detention when the *trooper told the defendant he was free to go after handing him the written warning and his documents*, but then, without pausing, asked the defendant if he had any drugs or other illegal contraband in his car and immediately received consent to search the car) (emphasis supplied); *Hayes v. State*, 292 Ga. App. 724, 725 (665 SE2d 422) (2008) (affirming the denial of a motion to suppress under similar circumstances but the officer also read a warning pursuant to *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), and had the defendant sign a written consent form).

12

a driver would believe that he is validly in a police officer's custody as long as the officer continues to interrogate him.[20]

Further, that Young's inquiry and request to search immediately followed the return of Hill's license does not require a different result because it is the unsupported additional detention to investigate other crimes and "to request consent to search [that] violated his Fourth Amendment rights."[21] "If an officer continues to detain an individual after the conclusion of the traffic stop and interrogates him or seeks consent to search without reasonable suspicion of criminal activity, the officer has exceeded the scope of a permissible investigation of the initial traffic stop."[22] Thus,

---

[20] (Punctuation and citation omitted.) *State v. McMichael*, 276 Ga. App. 735, 738-739 (1) (624 SE2d 212) (2005), questioned on other grounds by *Hayes*, 292 Ga. App. at 728 (2). Cf. *Robinette*, 519 U.S. at 41 ("'[M]ost people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accoutrements of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.'") (Ginsburg, J., concurring and quoting the Ohio Supreme Court).

[21] *Drake*, 355 Ga. App. at 794 (1), citing *Rodriguez*, 575 U. S. at 356-357 (II).

[22] (Punctuation omitted.) *Heard v. State*, 325 Ga. App. 135, 138 (1) (751 SE2d 918) (2013). See also *Weaver*, 357 Ga. App. at 491 (reversing the denial of a motion to suppress because "the officer continued to question Weaver and his passenger about multiple subjects unrelated to the purpose of the stop even after receiving an answer from dispatch regarding the legality of Weaver's license and registration.

13

the facts as found by the trial court do not support the legal conclusion that the encounter had become consensual and that Hill's acquiescence was voluntary.[23] Accordingly, we reverse the denial of Hill's motion to suppress the evidence obtained in the search that followed the traffic stop.[24]

2. Hill's remaining enumerations are moot.

*Judgment reversed. Reese and Brown, JJ., concur.*

---

Even if the officer's continued questioning of Weaver and the passenger about the scrap metal did not constitute an unreasonable prolongation of the stop, the officer should have ended the stop after he finished his questions as to that matter."); *Drake*, 355 Ga. App. at 794 (1) ("[D]etaining [the defendant] further [after the conclusion of the traffic stop and an initial consensual search] to request [additional] consent to search his person violated his Fourth Amendment rights."), citing *Rodriguez*, 575 U. S. at 356-357 (II); *Heard*, 325 Ga. App. at 138 (whole court); *Gonzales*, 255 Ga. App. at 150 ("Once a routine traffic stop has ended, an officer must have either valid consent or reasonable suspicion of criminal conduct before conducting additional questioning and searching a vehicle."). Compare *Salmeron*, 280 Ga. at 735 (1) (affirming because the officer asked for consent to search *before* the purpose of stop was fulfilled while diligently pursuing the allowable mission of the traffic stop).

[23] See *Felton*, 297 Ga. App. at 37-38 ("[Because] Felton's consent was not within the scope of the original traffic stop, nor consensual, the consent to search the vehicle was the product of an illegal detention, and it was not valid and the evidence obtained as a result of the illegal search [should be] suppressed.") (punctuation omitted).

[24] See id.