**FIRST DIVISION
DOYLE, C. J.,
BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 15, 2016**

# In the Court of Appeals of Georgia

A15A1947. THE STATE v. DEPOL.                                    BO-075C

BOGGS, Judge.

The State of Georgia appeals from the trial court's order granting Scott Depol's motion to suppress the results of a breath test based upon the Supreme Court of Georgia's recent decision in *Williams v. State*, 296 Ga. 817 (771 SE2d 373) (2015). Specifically, the trial court concluded that "the Defendant's apparent voluntary intoxication left him without the ability to voluntarily consent to a search of his breath with the use of a machine, despite the lack of threats, benefits or promises from any of the three officers present on the scene." For the reasons explained below, we reverse.

> [O]n appeal from a ruling on a motion to suppress, we defer to the trial court's factual findings and credibility determinations, but review de novo the court's application of the law to the undisputed facts. And

significantly, to the extent that the controlling facts "are undisputed because they are plainly discernable from the patrol car-mounted video recording," as they are in this case, we review those facts de novo.

(Citations, punctuation and footnotes omitted.) *State v. Mosley*, 321 Ga. App. 236 (739 SE2d 106) (2013). See also *Mack v. State*, 296 Ga. 239, 241 (765 SE2d 896) (2014) (de novo review of videotaped interview to determine if defendant waived Fifth Amendment rights); *Vergara v. State*, 283 Ga. 175, 178 (1) (657 SE2d 863) (2008) (de novo review of facts discernible from a videotape). "Although we owe substantial deference to the way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts. [Cit.]" *Hughes v. State*, 296 Ga. 744, 750 (2) (770 SE2d 636) (2015). This includes legal determinations based upon the totality of the circumstances. See, e. g., *Hughes*, supra, 296 Ga. App. at 749-752 (no deference owed to trial court's determination that totality of circumstances showed no probable cause to arrest); *Boyd v. State*, 315 Ga. App. 256, 257 (1) (726 SE2d 746) (2012) (applying de novo review of videotaped interview to determine if totality of circumstances showed that juvenile knowingly and voluntarily waived his Fifth Amendment right against self-incrimination);

2

*Franklin v. State*, 249 Ga. App. 834, 835 (1) (549 SE2d 794) (2001) (applying de novo review of tape recording and police officer testimony to determine whether confession voluntary).

In this case, the trial court ruled based upon the testimony of three sheriff's deputies in a previous motion to suppress hearing,[1] a video of the police interaction with Depol taken from a camera inside one of the deputy's patrol car, and previous findings of fact made in its order denying Depol's first motion to suppress made on other grounds. In its first order, the trial court made the following findings of fact:

> Corporal C. Prescott was dispatched to a 911 call in reference to a hit &run/striking fixed object call. Upon her arrival at the scene of the incident, she spoke to the property owner and attempted to locate the vehicle and driver involved at the Kroger down the street. When she was unsuccessful, she returned to the incident location. Shortly after her return, an unknown individual is heard arriving on scene and telling Corporal Prescott that a vehicle that appeared to be involved in an accident was at the auto parts store up the street with the driver trying to change a tire and "he's pretty drunk." It is apparent from her response and later actions that she did nor hear the last comment about possible intoxication. Immediately thereafter, she leaves the incident location and goes to the auto parts store. There, she finds the defendant outside his

---

[1] In his first motion to suppress, Depol's argument centered on the claim that the unreasonable length of his detention vitiated his consent to the breath test.

vehicle in the parking lot of the auto parts store. The vehicle is parked, doors open, and it appears the defendant is attempting to change a tire. She engages him in conversation, and he admits that he was in an accident and did leave the scene. Less than a minute after arriving on the scene, the defendant hands the officer his driver's license. She tells the defendant that she will need his insurance information to write a report, he indicates it just changed, and from there begins a long attempt of the defendant to get the insurance information. This attempt includes looking in the vehicle and making several phone calls.

Four minutes after arriving at the defendant's location, Corporal Prescott calls in the defendant's driver's license and tag information to dispatch. Approximately two minutes later a second officer arrives on scene. Corporal Prescott tells this officer that she doesn't smell anything and that she intends to give the defendant a ticket for leaving the scene. Two minutes later she receives information from dispatch that both the driver's license and tag are valid. Almost four minutes after receiving this dispatch information, the defendant has still not been able to locate any insurance information. He has been free to walk around his vehicle, get in and out of his vehicle, and at one point walk into and out of the auto parts store. At some point, the second officer begins to suspect that the defendant might be impaired and asks Corporal Prescott about doing an alcosensor on the defendant almost four minutes after the dispatch information was received. She reveals that she cannot smell anything at all. She never relays the information from an unknown individual about intoxication, and it appears she really never heard that information. The defendant denies consuming alcohol. The defendant continues to

4

attempt to get insurance information. At some point, a third officer arrives on scene. The audio cuts in and out at some points, as if someone cuts off their microphone.

Seven minutes after the first mention of an alcosensor, the defendant has still not been able to get any insurance information. The second officer tells the first officer that another officer is going to bring an alcosensor. It appears that even Corporal Prescott attempts to get the insurance information for him but is unsuccessful. The alcosensor arrives seven minutes after it was indicated that someone was bringing one. Corporal Prescott is assisted by another officer in operating it, and the *defendant voluntarily blows into it*. It registers positive for alcohol at approximately twice the legal limit (the number is shown on the video). From there, none of the three officers does any field sobriety evaluations. Corporal Prescott is clearly the lead officer on the case, and the others appear to be waiting for her to make a decision. The defendant appears to talk about some people in the sheriff's office that he knows. For ten minutes after the defendant blows into the alcosensor, all three officers are talking to the defendant and then conversing with each other, with the microphone turned off some. No insurance information has provided at this point still. Four more minutes elapse a[s] the other two officers appear to be attempting to let Corporal Prescott come to the conclusion that they have – which is to arrest the defendant for DUI. One officer even says, "I'd take him to jail – you have enough, crash, presence of alcohol, not last night." Finally Corporal Prescott tells the defendant he is under arrest. It has been approximately 42 minutes since Corporal Prescott arrived on scene. The

defendant was never able to provide any insurance information. It is the defendant's apparent inability to successfully find out his insurance information or even operate the telephone properly that attributes to the officers' suspicions of impairment. Additionally, during this lengthy interaction the defendant begins to sway and become unsteady on his feet. After the arrest, Corporal Prescott secures the defendant in the back of her patrol car and reads implied consent properly. Implied consent is read two minutes after the handcuffs go on the defendant. *He agrees to take the state's test*.

The above facts were gained from a review of the video. At the hearing, Captain Pinyan, the second officer to arrive on the scene, testified that the defendant's eyes were bloodshot and glassy and that he was chewing gum. He also testified that the defendant swayed while trying to talk on the telephone, and he appeared to be under the influence of something. Corporal Prescott also testified at the hearing and said that the defendant's eyes were bloodshot, his speech delayed, he swayed, and when asked if had been drinking said, "No, thank you." The defendant later said that he'd had "too much to drink," but that it was the night before.

(Emphasis supplied.) The trial court denied Depol's motion to suppress based upon its conclusion that probable cause existed for his arrest, the length of his detention was not unreasonable, and the implied consent notice was timely and properly read.

6

Six months later, Depol filed a supplemental motion to suppress based upon the Supreme Court's intervening decision in *Williams*, supra. In a second hearing before the trial court, it heard only argument of counsel before ruling from the bench that it would grant the motion. It stated, "All the reasons that I put in my order as to his demeanor are the same reasons that lend me to believe that he could not have formed a voluntary choice. He was, as you watch the video, and it's quite a lengthy video, it's very clear he's extremely impaired."

In its written order granting the second motion to suppress, the trial court expressly states that its ruling is based upon the findings of fact in its previous order, as well as the evidence and testimony presented in the first motion to suppress hearing, which had been held ten months before. It also stated:

> The issue at hand is whether the Defendant, in agreeing to submit to the State's breath test under the Georgia Implied Consent law, also made a voluntary decision to waive any remaining Fourth Amendment rights and consent to the search of his breath through the use of an Intoxilizer breath testing machine. After a review of the totality of the circumstances, this Court finds that the State did not carry its burden in proving that the Defendant voluntarily consented to taking the breath test.

It was clear from the video that the Defendant was extremely impaired. He had grave difficulty in using his cell phone. He was never able to utilize it to find insurance information. His physical demeanor clearly indicated he was under the influence – swaying, difficulty operating the cell phone, appearing confused as to recent time line of events, not appearing to work on changing his tire, delayed speech, not knowing whether he was coming from or going to hunt, unsure of when he had consumed alcohol. At one point, three officers were present on scene and yet the Defendant appeared to express no concern for why they were there. He felt free to roam the area, appearing to not fully understand the gravity of the situation. At one point, he is asked if he had been drinking said, "No, thank you." It is the defendant's apparent inability to successfully find out his insurance information or even operate the telephone properly that attributes to the officers' suspicions of impairment. The defendant appears to talk about some people in the sheriff's office that he knows, almost in a small talk fashion and not in an attempt to persuade the officers to not arrest him. This is odd considering others facing three officers likely would have felt an impending arrest. The alcosensor the Defendant took registered for alcohol at approximately twice the legal limit (the number is shown on the video).

Essentially, the officers clearly had sufficient probable cause to arrest the Defendant for DUI, but for all the same reasons, under a totality of the circumstances, it is also clear that the Defendant's intoxication left him in state in which he could not have formed a voluntary decision to waive his Fourth Amendment rights and consent

8

to providing a breath sample. . . . [I]n this particular case, the Defendant's apparent voluntary intoxication left him without the ability to voluntarily consent to a search of his breath with the use of a machine, despite the lack of threats, benefits or promises from any of the three officers present on scene.

We cannot determine from the transcript of the second hearing or the trial court's order whether it watched the video again in the six-month time period between its first and second orders. A review of the hearing transcript for the first motion to suppress shows that none of the deputies were asked any questions relating to the voluntariness of Depol's consent to a breath test after he was read the implied consent notice. Corporal Prescott testified only that after she read the implied consent notice to Depol, "he agreed" and her testimony is supported by the video. No evidence was presented about his education, intelligence, or medical conditions. According to the citation in the trial court record, Depol was 47 years old at the time of his arrest.

On appeal, the State contends that the trial court erred by concluding that it failed to meet its burden of proving that Depol voluntarily consented to the breath test. We agree.

In *Schneckloth v. Bustamonte*, 412 U. S. 218 (93 SCt 2041, 36 LEd 2d 854) (1973), the Supreme Court of the United States addressed at length what the prosecution must "prove to demonstrate that a consent [to search] was 'voluntarily' given." Id. at 223. It rejected knowledge of the right to refuse consent as a requirement for effective consent. Id. at 223, 234-246 (II) (B). See also *Woodruff v. State*, 233 Ga. 840, 844 (3) (213 SE2d 689) (1975). Instead, it adopted a "totality of the circumstances test" in which the knowledge of the accused is but one factor to be considered. *Schneckloth*, supra, 412 U. S. at 227 (II) (B). Accordingly, when the State relies upon the consent exception to the warrant requirement, "it has the burden of proving that the accused acted freely and voluntarily under the totality of the circumstances." (Citations, punctuation and footnote omitted.) *Williams*, supra, 296 Ga. at 821-822.[2]

---

[2] While the trial court's order stated the correct standard, we note that it also included some loose, less specific language about the issue before it. Specifically, the trial court framed it as follows: "The issue at hand is whether the Defendant, in agreeing to submit to the State's breath test . . . also made a voluntary decision *to waive any remaining Fourth Amendment rights* and consent to the search of his breath." (Emphasis supplied.) The issue, however, is not whether the defendant voluntarily decided to *waive* his Fourth Amendment rights, but rather whether he voluntarily *consented* to a breath test. "Where the trial court has used a wrong standard in reaching its conclusion, a remand may be appropriate where legitimate factual issues are raised. However, where there is no evidence which would authorize the grant of the motion to suppress, a remand is unnecessary." (Citations and

In a recent case applying *Williams*, supra, this court noted:

A "totality of the circumstances" analysis is not new to Georgia courts. "A consent to search will normally be held voluntary if the totality of the circumstances fails to show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent." *Cuaresma v. State*, 292 Ga. App. 43, 47 (2) (663 SE2d 396) (2008). Nor may consent be "coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218 228 (II) (B) (93 SCt 2041, 36 LEd 2d 854) (1973). Other factors to be considered are "prolonged questioning; . . . the accused's age, level of education, intelligence . . . and advisement of constitutional rights; and the psychological impact of these factors on the accused." *State v. Austin*, 310 Ga. App. 814, 818 (1) (714 SE2d 671) (2011). Moreover, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Schneckloth*, 412 U. S. at 227 (II) (B). Instead, the court should consider whether "a reasonable person would feel free to decline the officers' request to search or otherwise terminate the encounter." *Austin*, 310 Ga. App. at 820 (1) (citing *Johnson v. State*, 297 Ga. App. 847, 849 (678 SE2d 539) (2009)); *State v. Durrence*, 295 Ga. App. 216, 218 (671 SE2d 261) (2008). "Mere acquiescence to the authority asserted by a police officer cannot substitute for free consent." *State v. Jourdan*, 264 Ga. App. 118, 121 (1) (589 SE2d 682) (2003) (internal citation omitted); *Hollenback v. State*, 289 Ga. App. 516, 519 (657 SE2d 884) (2008).

punctuation omitted.) *State v. Davison*, 280 Ga. 84, 86 (2) (623 SE2d 500) (2005).

*Kendrick v. State*, Ga. App. (Case No. A15A2111, decided February 23, 2016).

In the context of determining whether a defendant has knowingly and voluntarily waived his right to be silent under the Fifth Amendment, we have held that "the mere fact that a defendant was intoxicated at the time of the statement does not necessarily render it inadmissable. If the evidence is sufficient to establish that the defendant's statement was the product of rational intellect and free will, it may be admitted even if the defendant was intoxicated when he made the statement." (Citations and punctuation omitted.) *McNear v. State*, 326 Ga. App. 32, 34 (2) (755 SE2d 844) (2014).

In this case, we have reviewed the video of Depol's interactions with the deputies and conclude that it cannot support the trial court's observation that it shows "the Defendant was extremely impaired" and "without the ability to voluntarily consent to a search of his breath." While Depol sways slightly at times, it is clear from the video of his approximately 45-minute interaction with the officers that he was capable of exercising sufficient free will to consent to a breath test. When the officer first approached him at the auto parts store, he exchanged appropriate and well-timed greetings with her, admitted that he ran off the road due to bad tires, and explained that he planned to return to where he ran off the road after he changed out

12

the bad tire.[3] During this exchange, he continually worked at unwinding something located on the floor of the rear hatch of his sport utility vehicle[4] while periodically turning his head to talk with the deputy. He stopped working only after the deputy asked him to get his driver's license and insurance information for her.

After pulling out his wallet and handing the deputy his driver's license, he walked quickly toward the driver's compartment of the car where he appeared to begin searching for his insurance information. After looking unsuccessfully for about two minutes, he told the officer that he had just changed his insurance. After another minute of unsuccessful searching, he told the deputy that his insurance carrier was Allstate. She replied, "If you wouldn't mind sir, I'm still gonna need you to contact someone to get the policy number." He acknowledged her request, and the deputy returned to her patrol car, leaving him in the driver's seat of his vehicle.

Approximately three minutes later, the deputy tells another deputy who has arrived as back-up that she didn't "smell any alcohol, he's not drunk . . . so he'll get a ticket for leaving the scene of an accident. . . . He's trying to call his Allstate

---

[3] The deputy acknowledged that the property owner told her that his property "was a hot spot for cars going off the roadway" and had "happened many times before."

[4] The deputy testified that he was attempting to get out his spare tire.

13

insurance." Three minutes later, Depol gets out of the car and looks at the damage to his tire with the back-up deputy and talks with this deputy for about two minutes, but their conversation cannot be heard on the video and the deputy almost entirely blocks the camera's view of Depol for a large portion of this conversation. At the end of their conversation, the deputy walks away from him to talk with the first deputy who appears to be seated in her patrol car, while Depol walks inside the auto parts store.

When Depol returns to his vehicle less than a minute later, the first deputy steps away from her patrol car and asks him whether he had been able to obtain his insurance information. Depol responded in the negative, removed his cell phone from the front seat and explained to the officer that he could not see the phone well because "his arms weren't long enough" as he demonstrated holding it far away from his body.[5] He continues trying to operate the phone while holding it out as far as he can from his body until he overhears the deputies discussing the amount of damage to the fence where he ran off the road. At that point, he looks up from the phone and interjects, "I'm going to pay for that." When the deputy explains that either he or his insurance company would have to pay for it, he repeats that he would pay for it.

---

[5] At one point in the video, Depol pats his shirt pockets as though he is looking for reading glasses, but his pockets are empty. The deputy testified that she believed Depol "was straining to try to read his [cell phone].

14

When the officers explained that they needed to verify he was driving with valid insurance, Depol stated, "Oh, I understand." As the officers continued to discuss with one another potential damage to a fire hydrant, Depol, interjected that he was calling 1-800-All-State. After hanging up, he asked the officer another question, and she responded that she still needed the policy number. While Depol continued trying to obtain the requested policy number, the officer also attempted to do it herself while back in her patrol car. Three minutes later, she states, apparently to herself, "Really, you just hung up on me. Seriously." When another officer approaches her a minute later, she responds, "I haven't even gotten it."

After another officer brings an alcosensor, the first deputy stated, "Mr. Depol, if you wouldn't mind, I'd like you to breathe into this just to make sure you are safe to drive." Depol responded, "I'm safe." After the device was explained, the officer instructed Depol to take a deep breath and blow. Depol followed her instructions without difficulty.

Approximately 14 minutes later, Depol was arrested and placed in handcuffs. Depol responded appropriately when the officer asked if he had a weapon in his vehicle. When a deputy explained that his car would be towed and that his weapon would be placed in evidence for safekeeping, Depol stated that he understood and

informed the officer that his gun was in a case and that there were no other weapons present. Immediately after this conversation, during which Depol responded in a timely and appropriate fashion, the first deputy read the implied consent warning to Depol and he replied, "yes ma'am," when asked if he would submit to the state-administered test.

Based upon our de novo review of the video and the other undisputed evidence before the trial court, we conclude that Depol voluntarily consented to a test of his breath.[6] Although he was under the influence of alcohol, the video clearly demonstrates that he was also capable of understanding what was said to him, able to freely and voluntarily consent, and actually did so. Accordingly, we reverse the trial court's grant of Depol's motion to suppress. See *State v. McMichael*, 276 Ga. App. 735, 739-740 (1) (624 SE2d 212) (2005) (reversing trial court's grant of motion to suppress after applying law to undisputed facts and determining that consent to

---

[6] Even under the clearly erroneous standard of review, we would have to reverse the trial court's decision to grant the motion to suppress in this case as the evidence demands the conclusion that Depol voluntarily consented to the state-administered breath test. See *State v. Kinsey*, 272 Ga. App. 723, 724 (613 SE2d 232) (2005) (physical precedent only). In its first order, the trial court expressly concluded that Depol voluntarily blew into the alcosensor and nothing which occurred in the 14 minutes between the alcosensor and Depol's consent to the state-administered breath test demonstrates that he was too intoxicated to freely and voluntarily consent.

16

search was voluntary); *State v. Brown*, 273 Ga. App. 148, 151 (2) (c) (614 SE2d 250) (2005) (same).[7]

*Judgment reversed. Doyle, C. J. and Rickman, J., concur*.

---

[7] Depol's argument that we should conclude that he merely acquiesced to a show of authority based upon the language of the implied consent notice has already been rejected by this court in *Kendrick*, supra, slip opinion at 9.