**July 15, 2016**

# In the Court of Appeals of Georgia

A16A0362. THE STATE v. DOMENGE-DELHOYO.

BOGGS, Judge.

In this DUI and hit-and-run case, the State appeals from the trial court's order granting Monique Domenge-Delhoyo's motion to suppress the results of a state-administered blood test. The State asserts that the trial court erred in concluding that Domenge-Delhoyo did not actually consent to the state-administered blood test under the totality of the circumstances. For the reasons explained below, we agree and reverse.

"In this Court's review of a trial court's grant or denial of a motion to suppress, the trial court's findings on disputed facts will be upheld unless clearly erroneous, and its application of the law to undisputed facts is subject to de novo review. [Cit.]" *Barrett v. State*, 289 Ga. 197, 200 (1) (709 SE2d 816) (2011). See also *Hughes v.*

*State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015); *State v. Bowman*, Ga. App. Slip op. at 1-2 (Case No. A16A0555, decided June 7, 2016). Based upon the video recording of Domenge-Delhoyo's encounter with the police at the time of her arrest and the reading of the implied consent warning, we will conduct a de novo review of this issue. See *State v. Depol*, 336 Ga. App. 191 (784 SE2d 51) (2016) (conducting de novo review of defendant's actual consent to breath test because "controlling facts are undisputed because they are plainly discernable from the patrol car-mounted video recording") (Citations and punctuation omitted.)

The evidence presented at the motion to suppress hearing shows that on August 29, 2014, some time between 11:00 p.m and midnight, Domenge-Delhoyo sideswiped the passenger side of a car traveling in the same direction as she passed in the right lane. A witness described it as sounding like "tire on metal" contact. She did not stop or slow down even though the hubcap of the other car came off and the passenger side mirror was dangling. When the driver of the car caught up with her at the next intersection about a half mile away, he informed her that she had hit his car and asked her to pull into a nearby parking lot. She seemed genuinely surprised to learn that she had struck his vehicle. In the parking lot, the car's driver determined that there was "no real bodily damage" to his car, and it is undisputed that he was not hurt. When

2

the driver asked Domenge-Delhoyo if she had been drinking, she said "no," and the driver "thought maybe she was in her right mind." He did not smell alcohol, "she spoke pretty well," and nothing made him believe that she was intoxicated other than the fact that she had hit his car without realizing it. He did notice that her eyes were glassy-looking and red.

When the car's driver noticed that a police officer was parked nearby, he reported the accident at the request of the person whose car he was driving. When the patrol officer questioned Domenge-Delhoyo about the car wreck and what had happened, she responded, "I just screwed up," explaining "that she had felt something but she wasn't sure what it was." The officer did not smell any alcohol, but based on the "huge delay" of "five to ten seconds" between his questions and her response, he "assumed she was under some sort of narcotic" and contacted a DUI specialist to assist him.

After the DUI officer[1] arrived, he spoke with Domenge-Delhoyo and made the same observations about her as the first officer, except that he smelled "a very faint odor of an alcoholic beverage coming from her breath." She initially denied drinking,

---

[1] This officer testified that he was also trained as a drug recognition expert with regard to "how drugs interact with the body."

but when the officer challenged her by stating that he could smell the odor of alcohol on her breath, she admitted "that she had one beer that night." When he asked her to step out of the truck, "[h]er exit was slow" and she had to hold on to the truck to steady herself. When he asked her to walk to the front of his patrol car (where the video camera was mounted), "[s]he was unsteady on her feet as she walked." The officer testified that as he continued to speak with her, Domenge-Delhoyo "seemed very annoyed at my questions . . . almost as if she didn't want to answer them. I guess kind of evasive." The video recording supports this testimony.

Toward the end of the DUI officer's conversation with Domenge-Delhoyo, he stated, "You see how this looks, right? I mean initially you told the officer you hadn't had nothing to drink and all of a sudden now it's one. And you sideswipe another car. I mean there really is no other explanation for it, I mean, . . . a couple of things are happening here (a) you were really distracted or (b)." At this point, Domenge-Delhoyo interrupted the officer and stated that she was distracted. The officer then asked if he could check her to make sure she was safe to drive. After Domenge-Delhoyo asked, "What does that mean?", the officer replied that there were some field sobriety evaluations that he would like to do. When she asked if she had to oblige and do it, he told her that they were "completely voluntary," but if he had to make a

4

decision to arrest, he wanted to do it based upon the most information he possibly could. He stated that he could smell alcohol on her breath and "[s]o, do I believe that you had the one? Maybe, maybe not." I don't know that you had just the one . . . sideswiping another car on a road and it's not very busy out, . . . so . . . no?" After Domenge-Delhoyo again responded "nope," the officer deliberated quietly for about 15 seconds before telling Domenge-Delhoyo to put her hands behind her back because she was under arrest for DUI.

As the officer attempted to take one of her arms and place it behind her back, Domenge-Delhoyo turned toward the officer stating, "What?" and placed her other hand on his to stop him. As she continued to wiggle and struggle against being placed in handcuffs for about 10 seconds, the officers told her to "stop moving," to "stop resisting," and to "relax." As both officers on the scene began to get her arms under control, Domenge-Delhoyo then asked, "Aren't you going to check me?" When the officer responded, "You said you didn't want to," Domenge-Delhoyo emphatically stated, "No. I want to." The officers then released her hands, and the DUI officer told Domenge-Delhoyo, "Okay, . . . I've already told you you're under arrest, okay, so because of that I gotta read you *Miranda*. These are your rights, okay." He then stated:

5

You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to speak to a lawyer and have him present for any questioning if you wish. If you cannot afford a lawyer one will be appointed to you to represent you before any questioning if you decide to exercise these rights and not answer any questions or make any statement. Do you understand these rights as I have read them to you?

Domenge-Delhoyo stated, "Yep," and the officer asked again, "Having these rights in mind, do you still want to do . . . the field sobriety evaluations?" and she confirmed, "Yeah." The officer then asked screening questions about her vision, injuries, and any medication. Domenge-Delhoyo informed him that she took Xanax for depression and had taken her normal dose that morning.

The officer's field sobriety evaluation revealed six out of six clues on the HGN, six out of eight clues on the walk and turn, and two out of four clues on the one leg stand. It took approximately ten minutes to complete these evaluations. When the officer took out an alco-sensor device, he explained to Domenge-Delhoyo that it would only reveal whether there was or was not alcohol present on her breath. After he unwrapped it and asked her to blow, Domenge-Delhoyo asked, "Wait, can I like decline that?" The officer informed her that it was completely voluntary, and she stated that she would decline it.

The officer then stated again that she was under arrest for DUI and asked her to place her hands behind her back, while Domenge-Delhoyo immediately began interjecting that she would take it. The video recording shows that for approximately 30 seconds, she wiggled her arms and struggled against the two officers who carefully attempted to place her hands behind her back, all the while asking her to "relax" and "stop moving." At one point, the patrol officer quietly and calmly told her that they would have to put her on the ground if she did not cooperate. They nonetheless kept carefully trying to get her hands behind her back while she was standing, but when the DUI officer took a hand off one of her arms to reach for his handcuffs, the patrol officer stated, "I'm losing her." At that point, the patrol officer performed a quick maneuver in which he moved one of Domenge-Delhoyo's forearms upward behind her back and then pushed her face-down onto the hood of the patrol car. While the open palm of her free hand and arm hit the hood before her body and made a loud sound, there was no loud sound when her body first touched the patrol car. After gaining control of Domenge-Delhoyo while she was against the hood of the car, the officers were finally able to place her in handcuffs. During the entire struggle, Domenge-Delhoyo repeatedly offered to take the test, but the officers informed her that they were "beyond that."

7

Once Domenge-Delhoyo was placed in handcuffs, the patrol officer immediately helped her back to a standing position. After searching her pockets, the DUI officer informed her that she needed to move to the passenger side of his car. While walking, she asked the officer if she could have her shoes and the officer told her he "would grab them in a second." He can be heard opening the car door and asking her to have a seat. He then immediately told her, "Anytime someone's placed under arrest in the State of Georgia for DUI, there's a statement we gotta read; there's gonna be a question at the end. This is called the Georgia Implied Consent Notice."

The officer read the following statement:

Georgia law requires you to submit to the state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your

8

own choosing. Will you submit to the state administered chemical tests of your blood under the implied consent law?

After he finished reading, Domenge-Delhoyo was silent for approximately six seconds before the officer asked, "Is that going to be a yes or a no?" Domenge-Delhoyo immediately replied, "yep." The officer clarified, "Yeah?" and she immediately stated again, "Yeah."

The DUI officer transported Domenge-Delhoyo to Gwinnett Medical Center, where medical personnel drew her blood at 1:27 a.m. At no time during the blood draw did Domenge-Delhoyo indicate that she did not want her blood drawn. A hospital supervisor testified that the hospital requires every suspect who is brought in for a blood draw by the police to sign a consent form and that copies of these forms are maintained in the ordinary course of business. If a suspect refuses, the hospital will not draw the blood.

The hospital's records include a consent form signed by the officer with a typed registration sticker with Domenge-Delhoyo's name, date of birth, and an admission date affixed to it. This form states:

> I request that the above specimen(s) be obtained from the person named above for purpose of chemical testing to determine the presence of alcohol or any other drug in accordance with Georgia law. I certify that

9

I am a law enforcement officer authorized to request such tests and that the person has been arrested for an offense pursuant to which I can request a specimen under Georgia law. I have properly advised the person, if conscious, of his or her rights under Georgia law.

**PATIENT CONSENT TO COLLECTION OF SPECIMEN**

A. *CONSENT*. I consent to the collection and testing of the above specimen(s) for the presence of alcohol or any other drug. I understand that I am permitted to refuse this test. I understand that the specimen(s) will not be tested by Gwinnett Hospital System, but will be sent to the State Crime Laboratory for testing. I understand that I am permitted to have additional test(s) performed by a qualified person of my own choosing at my own expense. I voluntarily consent to the collection of the specimen(s) and to release of those specimen(s) as stated above.

B. *REFUSAL*. I refuse to consent to collection and testing of the specimen(s) identified above. I have been informed by the officer requesting the test of the consequences of the refusal.

The officer signed under the first paragraph and indicated that a blood test was desired. The form includes a signature for the patient under Part A, titled "consent," as well as a signature for a witness to the consent, and both show a time and date.

Domenge-Delhoyo filed a motion in limine to exclude the blood test on numerous statutory grounds, including that she was not properly and timely advised

10

of her implied consent rights. Six months later, she filed a brief asserting that the state-administered test results should be excluded because the State would not be able to demonstrate, under the totality of the circumstances analysis of *Williams v. State*, 296 Ga. 817 (771 SE2d 373) (2015), that she had freely and voluntarily consented to the test. In the hearing on the various motions filed by Domenge-Delhoyo, her counsel argued only the following issues: the validity of the initial detention; whether or not there was reasonable articulable suspicion to expand the scope of the stop from the initial detention; the sufficiency of the *Miranda* warning; the *Williams* issue regarding the validity of the consent to the blood test; and the qualifications of the person who drew her blood at the hospital. Defense counsel made no argument concerning any delay between arrest and the reading of the implied consent notice.

Following the hearing, the trial court issued a written order granting Domenge-Delhoyo's motion to suppress based *solely* upon its conclusion "that the State has not met its burden of establishing that the Defendant acted freely and voluntarily under the totality of the circumstances in submitting to the blood test."

In its order granting the motion to suppress, the trial court reasoned:

The facts of this case simply do not support a finding that the Defendant actually consented to the state-administered blood test. The Defendant

11

stated that she would submit to the state-administered test only after she was . . . pushed upon the hood of a patrol car, forcibly placed in handcuffs, and read the Implied Consent advisement. The Court finds that the most probative evidence of whether the Defendant actually consented to the state-administered blood test was the Defendant's refusal to submit to a preliminary breath test. The preliminary breath test, which is less invasive tha[n] a blood test, was requested prior to arrest, and the Defendant was told by [the officer] that the preliminary breath test was voluntary. Because the Defendant did not voluntarily submit to a pre-arrest preliminary breath test, it does not logically follow that after bring forcibly arrested and read the Implied Consent advisement, the Defendant would actually consent to a more invasive blood test.

In a footnote, the trial court stated: "The State introduced evidence of a consent form produced by and for the Gwinnett Medical Center. The Court considered this evidence and is not persuaded that it shows any desire by the Defendant to actually consent to the blood draw and test that the Defendant had been informed was required by Georgia law." Based upon the foregoing reasoning, the trial court "suppressed from evidence in the trial of this case" the results of the state-administered blood test.

1. The sole issue raised by the State in this appeal and briefed by the parties is whether the trial court erred by concluding that the totality of the circumstances showed that Domenge-Delhoyo did not actually consent to the state-administered

12

blood test. When considering whether a defendant has actually consented to a test of her blood under the Fourth Amendment, the State has the burden of proving that the accused acted "freely and voluntarily under the totality of the circumstances." (Citations and punctuation omitted.) *Williams*, supra, 296 Ga. at 821.

> A "totality of the circumstances" analysis is not new to Georgia courts. "A consent to search will normally be held voluntary if the totality of the circumstances fails to show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent." Nor may consent be "coerced, by explicit or implicit means, by implied threat or covert force." Other factors to be considered are "prolonged questioning; the accused's age, level of education, intelligence . . . and advisement of constitutional rights; and the psychological impact of these factors on the accused." Moreover, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Instead, the court should consider whether "a reasonable person would feel free to decline the officers' request to search or otherwise terminate the encounter." "Mere acquiescence to the authority asserted by a police officer cannot substitute for free consent."

(Citations omitted.) *Kendrick v. State*, 335 Ga. App. 766, 769 (782 SE2d 842) (2016). And,

13

> [i]n the context of determining whether a defendant has knowingly and voluntarily waived his right to be silent under the Fifth Amendment, we have held that the mere fact that a defendant was intoxicated at the time of the statement does not necessarily render it inadmissible. If the evidence is sufficient to establish that the defendant's statement was the product of rational intellect and free will, it may be admitted even if the defendant was intoxicated when he made the statement.

(Citations and punctuation omitted.) *Depol*, supra, 336 Ga. App. at 198. But, "[a] defendant's level of intoxication may be an appropriate factor for consideration among the totality of the circumstances in determining the voluntariness of consent. [Cit.]" *State v. Williams*, Ga. App. Slip op. at 12 (Case No. A16A0509, decided July 7, 2016); *State v. Jung*, Ga. App. Slip op. at 9-10 (Case No. A16A0527, decided July 7, 2016); *Bowman*, supra, slip op. at 12.

In this case, however, the trial court did not conclude that Domenge-Delhoyo was too intoxicated to consent. Rather, it found the officer's conduct in pushing her on the hood of the patrol car and forcibly placing her in handcuffs before reading the implied consent warning significant to its conclusion that the consent was not voluntary. But the record shows without dispute that the officer did not read the implied consent warning to Domenge-Delhoyo while she was on the hood of the car. Instead, he did so after she was assisted from the hood of the car, after she asked him

14

to retrieve her shoes, which he agreed to do, and after he asked her in a calm and polite voice to "have a seat" in the patrol car. Before reading the implied consent notice, he informed her that there would be a question at the end, he asked whether her answer was yes or no after he read the notice, he confirmed again that her answer was indeed yes after she had already answered in the affirmative once, and the evidence included the hospital's consent form that gave her the option of refusing consent.

The trial court's logic that Domenge-Delhoyo would not have actually consented to the state-administered test because she chose not to participate in the alco-sensor field sobriety test utilizes an improper subjective standard for determining consent. The standard is one of "objective reasonableness," requiring consideration of "whether a reasonable person would feel free to decline the request," *State v. Hamby*, 317 Ga. App. 480, 483 (731 SE2d 374) (2012), not whether the defendant may have subjectively preferred not to consent, but nonetheless made a decision to actually consent. The trial court also overlooks that Domenge-Delhoyo was properly advised that she could lose her driver's license if she refused, a consequence not attendant with a refused alco-sensor test.

15

Based upon the undisputed evidence in the video recording and our application of the law to these undisputed facts, we conclude that the State met its burden of proving actual consent under the totality of the circumstances. "As there is no evidence that [Domenge-Delhoyo]'s consent was anything but free and voluntary, the trial court erred in granting the motion to suppress." *State v. Reid*, 337 Ga. App. 77, 78 ( SE2d ) (2016) (written consent indicating that blood test was for purpose of determining presence of alcohol in blood along with video of stop supported reversal of trial court's grant of motion to suppress).[2]

2. The dissent asserts that we should affirm the trial court's grant of the motion to suppress in this case on an alternative ground: the police officer failed to timely inform the defendant of her implied consent rights. But this ground was not argued in the motion to suppress hearing, not ruled upon by the trial court, and not addressed by the parties in their briefs on appeal.[3] While we recognize that this court can affirm

---

[2] To the extent the trial court concluded that the notice read by the trooper informed Domenge-Delhoyo that her consent was *required* by law, it erred. See *Kendrick v.State*, 335 Ga. App. 766, 771 (782 SE2d 842) (2016) ("the implied consent notice accurately recites Georgia law as contained within OCGA § 50-6-67.1 (b) (2) and informs suspect of her choice of either agreeing or refusing to submit to chemical testing, and the possible consequences for each choice").

[3] Indeed, if the defendant were appealing a *denial* of her motion to suppress, we would conclude that the ground relied upon by the dissent has been abandoned.

the grant of a motion to suppress if it is right for any reason raised below, *Dukes v.*

*State*, 323 Ga. App. 734, 738 (2) n. 22 (747 SE2d 895) (2013), the ground relied upon

by the dissent does not support the trial court's grant of a motion to suppress here.

In *Perrano v. State*, 250 Ga. 704 (300 SE2d 668) (1983), the Georgia Supreme

Court held

> "[W]here a law enforcement officer requests a person to submit to a
> chemical test because of acts alleged to have been committed while
> operating a motor vehicle [while] under the influence of alcohol or
> drugs, and the officer arrests that person on this ground, OCGA §
> 40-6-392 (a) (4) . . . requires that the officer inform him at the time of
> arrest of his right to an independent chemical analysis to determine the
> amount of alcohol or drugs present in his blood. *Under ordinary*
> *circumstances, where this advice is not given at the time of arrest, or at*
> *a time as close in proximity to the instant of arrest as the circumstances*
> *of the individual case might warrant*, the results of the
> state-administered test will not be admissible at trial to show that the
> accused was driving under the influence of alcohol or drugs. Further,
> where, in the ordinary situation, this advice is not given at the time of
> arrest, the state may not use the accused's refusal to submit to the

---

See *Owens v. State*, 308 Ga. App. 374, 380 (3) (707 SE2d 584) (2011) (appellant abandoned motion to suppress ground mentioned in written motion because appellant failed to raise and argue it during the hearing and failed to obtain a ruling on issue from trial court). See also *Barber v. State*, 236 Ga. App. 294, 297 (2) n. 1 (512 SE2d 48) (1999); *Nelson v. State*, 224 Ga. App. 623, 624 (1) (481 SE2d 605) (1997).

> state-administered test to suspend his driver's license under OCGA § 40-5-55 (c).

(Emphasis supplied.) Id. at 708. Although the implied consent notice in *Perrano* was not given at the moment of arrest, the Supreme Court concluded that the blood test given 30 minutes after arrest was nonetheless admissible because it was not appropriate for the officer to give the notice at a time immediately following a "fracas" that occurred between the police officer, the defendant, and his wife while the officer was arresting the defendant. Id. In the Supreme Court's view, these facts "would have rendered any notice of a right to an independent blood analysis meaningless if given at the time of physical arrest" and "[i]t was not inappropriate, in this situation, for the officer to advise [the defendant] of this right at the hospital prior to the administration of the state's test." Id.

Following the Supreme Court's decision in *Perrano*, this court has had numerous occasions to examine the particular facts before us and conclude that the implied consent notice was timely read even though it was not given immediately after an arrest. See *Lynch v. State*, 293 Ga. App. 858, 860-862 (1) (667 SE2d 264) (2008) (15-30 minutes after presumed arrest was timely); *Dunbar v. State*, 283 Ga. App. 872, 875 (2) (643 SE2d 292) (2007) (25 minutes after arrest was timely); *Naik*

18

*v. State*, 277 Ga. App. 418 (626 SE2d 608) (2006) (18 minutes after arrest was timely); *State v. Marks*, 239 Ga. App. 448, 453 (2) (521 SE2d 257) (1999) (18 minutes after arrest was timely); *Edge v. State*, 226 Ga. App. 559, 560 (1) (a) (487 SE2d 117) (1997) (2 hours after arrest was timely), overruled on other grounds, *Zilke v. State*, Ga. (Case No. S15G1820, decided June 2016); *Martin v. State*, 211 Ga. App. 561, 562 (440 SE2d 24) (1993) (10 minutes after arrest was timely) (1993); *Highsmith v. City of Woodbury*, 189 Ga. App. 58, 59-60 (1) (375 SE2d 79) (1988) (16 minutes after arrest timely); *Fore v. State*, 180 Ga. App. 196 (348 SE2d 579) (1986) (20-25 minutes after arrest was timely); *Mason v. State*, 177 Ga. App. 184, 186 (2) (338 SE2d 706) (1985) (20-30 minutes after arrest was timely); *Horah v. State*, 173 Ga. App. 306, 307-308 (1) (325 SE2d 917) (1985) (15-30 minutes after arrest was timely). Factors which have weighed into our decision to conclude that the notice was timely include: whether the notice was given at the earliest time at or after arrest "when it would be meaningful and defendant could make an intelligent choice"[4]; "[i]n a situation where an officer properly delays the reading of implied consent for a brief period in order to attend to the exigencies of police work, it would appear incumbent upon a defendant to demonstrate how she would have benefitted by being read the

[4] *Lee v. State*, 177 Ga. App. 8, 10 (3) (338 SE2d 445) (1985).

19

implied consent notice earlier"[5]; and that the notice was given on the scene of the arrest rather than after transport to another location.[6]

On fewer occasions, this court has concluded that the implied consent notice was not timely read after arrest. See *Thrasher v. State*, 300 Ga. App. 154, 155-157 (1) (684 SE2d 318) (2009) (finding trial counsel ineffective for failing to move to suppress test results where 57 minute delay between arrest and reading of notice after transport to jail); *State v. Austell*, 285 Ga. App. 18, 19-21 (645 SE2d 550) (2007) (45 minute delay between arrest and reading of notice after transport to jail); *Dawson v. State*, 227 Ga. App. 38, 40 (2) (488 SE2d 114) (1997) (more than 45 minute delay between arrest and reading of notice after transport to jail); *State v. Lamb*, 217 Ga. App. 290, 291 (456 SE2d 769) (1995) (more than 30 minute delay between arrest and reading of notice after transport to police station); *Clapsaddle v. State*, 208 Ga. App. 840, 841-842 (1) (432 SE2d 262) (1993) (one hour delay between arrest and reading of notice after transport to police station); *Vandiver v. State*, 207 Ga. App. 836, 837-

---

[5] *Marks*, supra, 239 Ga. App. at 453-454 (2) (reversing trial court's grant of motion to suppress).

[6] *Dunbar*, supra, 283 Ga. App. at 875 (2); *Horah*, supra, 173 Ga. App. at 307 (1).

20

838 (1) (429 SE2d 318) (1993) (unknown length of delay before notice read after transport to police station).

Based upon the particular facts and circumstances of this case, the officer's implied consent notice was given "at a time as close in proximity to the instant of arrest as the circumstances of the individual case might warrant." *Perrano*, supra.[7] The 20-minute delay resulted from the exigencies of police work[8] based upon the defendant changing her mind about performing field sobriety tests and the officer

---

[7] We note that the trial court's order states that the alco-sensor test "was requested prior to arrest," even though this request took place after the officer first told Domenge-Delhoyo she was under arrest and attempted to place her in handcuffs. For purposes of this analysis, we nonetheless assume, without deciding, that the arrest took place when the officer first attempted to place Domenge-Delhoyo in handcuffs.

[8] We disagree with the dissent's assertion that "exigent circumstances" must "justify the delay in reading the implied consent notice" rather than considering whether, under the particular circumstances of this case, "the exigencies of police work prevent the giving of advice." See *Marks*, supra, 239 Ga. App. at 453 (2). Previous "exigencies of police work" recognized by this court are typically related to the officer's investigation of the particular accident or traffic stop giving rise to the arrest, and not a completely unrelated police matter. See, e. g. *Dunbar*, supra, 283 Ga. App. at 295 (2) (officer attended to intoxicated passenger on scene and called tow truck); *Mason*, supra, 177 Ga. App. at 186 (2) (officer completed accident scene investigation and dealt with hazard created by wrecked vehicle). Compare *Fore*, supra, 180 Ga. App. at 196 (officer read implied consent after responding to a call resulting in second arrest while defendant in patrol car).

21

complying with her request to check her to see if she was safe to drive.[9] While there was no testimony on this issue, probably due to it not being raised in the motion to suppress hearing, it is reasonable to conclude that Domenge-Delhoyo changed her mind with the hope that she could change the officer's mind about arresting her if she performed well on the field sobriety tests. When the officer placed her in handcuffs after the field sobriety tests concluded, he promptly read the implied consent notice after placing her in the back of the patrol car. This record fails to show how the defendant would have benefitted from the notice being read earlier. Indeed, it may have caused confusion for it to have been read before the officer asked for an alco-sensor test as part of the field sobriety evaluation. See *Crawford v. State*, 246 Ga. App. 344, 346 (2) (540 SE2d 300) (2000) ("implied consent notice should not be read before the administration of the alco-sensor test because that may mislead the driver into believing that he or she is required to submit to that test"). Accordingly, this court should not affirm the trial court's grant of the motion to suppress on the alternative ground advanced by the dissent.

---

[9] While the dissent correctly references authority that concludes standard practices or routines of waiting to provide a warning do not qualify as "exigencies of police work," see *Vandiver*, supra, 207 Ga. App. at 838 (1), this case does not involve a standard practice or routine. Instead, the officer was responding to circumstances as they arose.

*Judgment reversed.  Branch, Rickman and Mercier, JJ., concur.  Miller, P. J., Ellington, P. J., and McMillian, J., concur in the judgment only.  Barnes, P. J., and McFadden, J., dissent.*

A16A0362. THE STATE v. DOMENGE-DELHOYO.           BA-xx

BARNES, Presiding Judge.

Because the trial court should be affirmed on the alternative ground raised below that Domenge-Delhoyo was not timely advised of her implied consent rights, I respectfully dissent.[1]

"OCGA § 40-5-55 (a), provides that any person who operates a motor vehicle in this state and is arrested for DUI is deemed to have given consent to chemical tests of his bodily substances to determine the presence of alcohol or drugs." *Lee v. State*, 324 Ga. App. 28, 29 (1) (749 SE2d 32) (2013). The purpose of providing the implied consent notice in accordance with OCGA § 40-6-392 (a) (4) is to notify drivers of their rights so that upon arrest, they can make informed decisions. *Garrett v. Dept. of Public Safety*, 237 Ga. 413, 415 (2) (228 SE2d 812) (1976).

---

[1] Although the majority contends that this ground is not properly before the Court, Domenge-Delhoyo filed a motion in limine to exclude the blood test on statutory grounds, including that *she was not properly and timely advised of her implied consent rights*.

OCGA § 40-6-392 (a) (4) provides, in pertinent part, that "[t]he arresting officer *at the time of arrest shall advise the person arrested of his rights to a chemical test* or tests according to this Code section."(Emphasis supplied.) Our Supreme Court has held that "the mandatory language [in OCGA § 40-6-392 (a) (4) that] '[t]he arresting officer at the time of the arrest shall advise the person arrested of his rights'. . . cannot be interpreted to mean sometime in the future. One cannot make an intelligent choice to submit to a chemical test without the knowledge of the right to have an independent test made in order to contest the validity of the state's test." *Garrett v. Dept. of Public Safety*, 237 Ga. at 415 (2). Therefore, "OCGA § 40-6-392 (a) (4) is construed "narrowly, to mean almost literally what it said," specifically that the officer is required to inform a defendant at the time of arrest of his rights to an independent chemical analysis to determine the amount of alcohol or drugs present in his blood. *Vandiver v. State*, 207 Ga. App. 836, 837 (1) (429 SE2d 318) (1993); OCGA § 40-6-392 (a) (4). And "where implied consent rights are not read at the time of arrest, or at a time as close in proximity to the instant of arrest as the circumstances of the individual case might warrant, the results of the state-administered test will not be admissible at trial[.]") (Citation and punctuation omitted). *Hough v. State*, 279 Ga. 711, 716 (2) (620 SE2d 380) (2005). "[T]he state

2

has the burden of demonstrating compliance with the implied consent notice requirements." (Citations omitted.) *Miller v. State*, 238 Ga. App. 61, 62 (1) (516 SE2d 838) (1999).

Here, the record reflects that at approximately two minutes into the encounter, Domenge-Delhoyo refused to perform the requested field sobriety tests, after which the officer told her that she was under arrest for DUI and asked her to put her hands behind her back. Domenge-Delhoyo then agreed to perform the field sobriety tests, and the officer stopped handcuffing her, but informed Domenge-Delhoyo that she was "already. . . under arrest," and advised her of her *Miranda* rights. The officer then performed several field sobriety tests, and approximately 15 minutes later asked her if she would perform a preliminary breath test. Domenge-Delhoyo refused, but when she subsequently agreed as she was being placed in handcuffs, the officer again said that it was too late because she was under arrest. Finally, Domenge-Delhoyo was handcuffed, placed in the patrol car, and read her implied consent rights. She then consented to having her blood drawn.

Absent exigent circumstances, Georgia courts have found that "our law demands that the rights be read at the time of arrest, or at a time as close in proximity to the instant of arrest as the circumstances of the individual case might warrant."

3

(Citation and punctuation omitted.) *State v. Austell*, 285 Ga. App. 18, 18-19 (1) (645 SE2d 550) (2007). "[S]ubstantial compliance is not sufficient . . . the officer *must* give the warning when he arrests the defendant unless there is a good reason not to." *Dawson v. State*, 227 Ga. App. 38, 40 (2) (488 SE2d 114) (1997).

In this case, there were no exigent circumstances that would excuse the delay of approximately 20 minutes between Domenge-Delhoyo's arrest for DUI and the reading of her implied consent rights. I agree with the majority that it is entirely feasible that an officer may delay the reading of implied consent for a brief period to attend to the exigencies of police work. And, the majority has provided an extensive list of cases demonstrating exactly that proposition. This case, however, is not such an instance.

Based on probable cause that Domenge-Delhoyo was intoxicated, the officer arrested Domenge-Delhoyo at approximately three minutes into their encounter. Although informing her that she was already under arrest and *Mirandizing* her, the officer then proceeded to conduct an almost 20-minute, essentially immaterial DUI investigation, before finally putting Domenge-Delhoyo into his vehicle and reading her the implied consent notice. There was no need for the officer to conduct field sobriety tests because Domenge-Delhoyo was already under arrest for DUI. The

4

officer made clear to her that she was under arrest, and that her cooperation in performing the tests was too late.

As the record reflects, the officer used the period between the arrest and the reading of the implied consent notice not to address an exigency or engage in any necessary "police work," but simply to continue a DUI investigation for which Domenge-Delhoyo had already been arrested. See *State v. Lamb*, 217 Ga. App. 290, 291-292 (456 SE2d 769) (1995) (the officer "preferred" to read the implied consent warning in the presence of a witness, resulting in the defendant's transport to the police station and an unlawful 30-minute delay); *Clapsaddle v. State*, 208 Ga. App. 840, 841-842 (1) (432 SE2d 262) (1993) (the accused was not given his implied consent rights until after he was transported to the jail, for no apparent reason). The standard police work in this case was not an exigency necessitating the delay in the timely reading of the implied consent notice and thus was not given "as close in proximity to the instant of arrest as the circumstances of the individual case might warrant." *Vandiver*, 207 Ga. App. at 837 (1) (standard practice of waiting to give the warning until the defendant was at the jail did not justify delay).

Given these circumstances, it is apparent that the officer did not "advise[] [Domenge-Delhoyo] of [her] implied consent rights in as accurate, timely, and

practical a manner as dictated by the circumstances." *Martin v. State*, 211 Ga. App. 561, 562 (440 SE2d 24) (1993). Accordingly, although on alternative grounds, I would affirm the trial court's order granting Domenge-Delhoyo's motion to suppress. See *Mathis v. State*, 279 Ga. 100, 102 (3) (a) (610 SE2d 62) (2005) (explaining that "[appellate courts] will affirm a trial court's ruling if it is right for any reason"); *Vandiver*, 207 Ga. App. at 838 (1) (test results are inadmissible against defendant because of the invalid procedure).

I am authorized to state that Judge McFadden joins in this dissent.

On Motion for Reconsideration

In her motion for reconsideration, Domenge-Delhoyo points this court to the United States Supreme Court's recent opinion in *Birchfield v. North Dakota*, __ U. S. __ (195 LE2d 560) (2016), notes that this court did not mention it, and asserts that it "may have a significant impact on the analysis of the voluntariness of the Appellee's consent to the state-administered blood test." We disagree. This Court did not include a discussion of the *Birchfield* opinion because it has no application to the facts before us.

The Supreme Court's holding in *Birchfield* is limited to those states in which criminal penalties are imposed based upon a refusal to submit to a blood test. Id. at 589 (VI). Indeed, it expressly noted:

> Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply. See, e.g., *McNeely*, supra, at ___, 133 S. Ct. 1552, 185 L. Ed. 2d 696, 710 (plurality opinion) (slip op., at 18); *Neville*, supra, at 560, 103 S. Ct. 916, 74 L. Ed. 2d 748. Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them.

Id. at 588-589 (VI). And while it remanded one of the cases before it to the state court "to reevaluate [the defendant]'s consent given the partial inaccuracy of the officer's advisory," the notice given in that case stated that a test refusal was itself a crime. Id. at 573-574 (II) (C) and 590 (VII).

Here, the notice given to Domenge-Delhoyo did not state that it was a crime

for her to refuse to allow a blood test, and she points to no law in Georgia imposing criminal penalties for refusing a blood test. Our criminal statute governing misdemeanor obstruction of a law enforcement officer, see OCGA § 16-10-24, does not bring this case within the ambit of *Birchfield*, particularly when our implied consent law does not require police officers to inform those arrested for DUI that they could be arrested for obstruction if they refuse a blood test.